**Alex APOLINAR, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–02–00659–CR.**

Court of Appeals of Texas, Houston (1st Dist.).

May 22, 2003.

Ernest Davila, Houston, TX, for Appellant.

Lori Deangelo Fix, Assistant District Attorney, William J. Delmore, III, Chief Prosecutor, Appellate Division, Charles A. Rosenthal, Jr., District Attorney—Harris County, Houston, TX, for Appellee.

Panel consists of Justices TAFT, KEYES, and HIGLEY.

## OPINION

TIM TAFT, Justice.

A jury convicted appellant, Alex Apolinar, of aggravated robbery and assessed punishment at 35 years in prison and a $10,000 fine. *See* Tex. Pen.Code Ann. §§ 29.03(a)-(b), 12.32 (Vernon 2003). We determine (1) whether the evidence was factually sufficient to show that appellant was the perpetrator; (2) whether the admission of extraneous-offense evidence at the punishment phase, if error, was harmful; (3) whether appellant carried his burden of showing that his trial counsel was ineffective for failing to object to a voir dire statement by the trial court; (4) whether the trial court erred in admitting a hearsay statement under the excited-utterance exception; (5) whether the trial court erred in overruling appellant's objection under Rule of Evidence 403 [1] to testimony referring to extraneous bad acts; and (6) whether appellant preserved his

1. *See* Tex.R. Evid. 403.

2. *See Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

complaint about an alleged *Brady*[2] violation. We affirm.

## Facts

Seventy-one-year-old Pelagio Jimenez was beaten, stabbed in the abdomen, and robbed of cash on August 17, 2001, a Friday. Jimenez was able to disarm his attackers and to stab one in the chest and the other in the arm. A witness to the attack, Albert Thompson, called police right away.

The first officers arrived within two or three minutes of Thompson's call. They found Jimenez on the ground, lying in a pool of blood and going into shock. The only information that Jimenez could relate was *cuchillo* ("knife") and *dos* ("two"), which he said when asked for the number of attackers.[3]

Thompson told the officers that two Hispanic men had attacked Jimenez and had then fled in different directions. An unnamed witness also told the officers that Jimenez had stabbed at least one of his assailants. The officers immediately began searching the area for suspects, and within three to five minutes after their arrival, they found two Hispanic men, both bleeding, who were walking down a nearby street that was within walking distance of the crime scene. The two men were appellant and Victor Badillo.[4] Despite being wounded, neither man asked the officers for help, and when appellant first saw the officers, he started to walk away. The men stopped upon the officers' command.

Appellant had a one-inch stab wound on his forearm. Badillo had several stab

3. Although Jimenez spoke Filipino, he apparently also understood some Spanish. He did not speak English.

4. The police were not able to locate Badillo after that evening.

wounds, one in his chest. When questioned about their wounds, appellant and Badillo told the officers that they had been attacked and stabbed by several African-American men in an area near where Jimenez was attacked. However, the officers found the alibi unconvincing and suspicious because appellant and Badillo could not give details of the alleged attack, their stories conflicted, appellant could not say what had been stolen from him, and the officers believed it was unlikely that two such attacks would happen close in time and place. The officers did not arrest appellant and Badillo, but instead called an ambulance for them.

The officers did not thoroughly search appellant that night because he was not under arrest. They searched the scenes of the crime and the detention, but found neither money nor a knife. The next day, the police found a knife at the crime scene. The knife had no blood on it, but an officer testified that the blade was consistent with the wounds that both appellant and Jimenez had suffered.

Jimenez had surgery the night of the attack. The hospital notified his daughter, Juliet Ralph. Jimenez was unable to speak coherently to his daughter until four days later, when he told her about the attack and mentioned that he had stabbed one of his attackers in the chest and the other in the arms.

A week later, on August 28, a police officer showed Jimenez a photographic array, from which Jimenez, through his daughter's interpreting, positively identified appellant.[5] Jimenez also told the offi-

cer that he had stabbed one of his attackers in the chest and the other in the side or the back. The next day, the police obtained a warrant and arrested appellant, who at that time had neither a knife nor money on his person.

## A. Factual Sufficiency of the Evidence

In issue one, appellant claims that the evidence is factually insufficient to show that he was the attacker.

In a factual-sufficiency review, we examine all of the evidence neutrally and ask whether proof of guilt is so obviously weak as to undermine confidence in the jury's determination or so greatly outweighed by contrary proof as to indicate that a manifest injustice has occurred. *See Zuliani v. State*, 97 S.W.3d 589, 593–94 (Tex.Crim.App.2003). We must avoid substituting our judgment for that of the factfinder. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex.Crim.App.2000). The factfinder is the sole judge of the weight and credibility of witness testimony. *Id.* In our review, we must consider the most important evidence that the appellant claims undermines the jury's verdict. *Sims v. State*, 99 S.W.3d 600, 603 (Tex.Crim.App., 2003).

Appellant argues that the evidence identifying him as an assailant was factually insufficient because Jimenez's in-court identification of appellant was weak;[6] the eyewitness testimony conflicted or was not believable;[7] appellant's alibi was allegedly not investigated; no physical evidence connected appellant to the attack; and Jimenez's claim that he stabbed his attackers

---

5. Jimenez could not, however, identify Badillo from a second array.

6. Jimenez demonstrated memory, comprehension, and vision problems throughout his testimony. Jimenez took a long time to identify appellant in court.

7. Appellant notes that Thompson told police that the attackers ran in different directions, but the police, who arrived only minutes later, found the men walking near each other. Appellant argues, "It was not likely that two stabbed men would run in different directions and meet up about two blocks away."

was not believable because Jimenez was old and feeble and because neither Jimenez nor the assailants had injuries to their hands that were consistent with having struggled over a knife.

First, the credibility and the weight to be given any witness's testimony was for the jury to assess. *See Johnson,* 23 S.W.3d at 7. Second, Jimenez did identify appellant three times at trial, even if Jimenez also appeared confused or had trouble seeing. An officer also testified that Jimenez was "very coherent" when he identified appellant from the array only 11 days after the attack, and Juliet testified that Jimenez seemed "certain" in identifying appellant from the array and was "alert" that day. Third, we note that the eyewitness testimony was fairly consistent in describing both the fact of the attack and appellant's and Badillo's general appearance. Fourth, the record shows that police did visit appellant to investigate the alleged attack on him, but appellant could give few details. In any event, several officers thought that appellant's and Badillo's alibis were suspicious and unbelievable. Fifth, the fact that the police found no evidence on appellant at any time or at the crime scene the night of the attack is not dispositive: police did not search appellant thoroughly the night of the attack, he was not arrested until 12 days later, and police found a knife, with a blade consistent with appellant's wound, the very next day. The fact that the knife had no blood on it went to the weight of that evidence, which was for the jury to assess. *See id.* Sixth, although appellant had no wounds on his hands, two officers testified that appellant's arm wound was consistent with his having taken a defensive posture during the assault.

Resolving these factual disputes was for the jury. *See id.* We hold that the evidence on which appellant relies does not render the remaining evidence factually insufficient to support the verdict.

Accordingly, we overrule issue one.

## B. Evidence of Unadjudicated Extraneous Offense Admitted at Punishment

In issue three, appellant claims that the trial court erred in allowing Officer Corley to testify during punishment about an unadjudicated extraneous offense because the State had not given adequate notice under Code of Criminal Procedure article 37.07, section (3)(g), which provides:

> On timely request of the defendant, notice of intent to introduce evidence under this article shall be given in the same manner required by Rule 404(b), Texas Rules of ... Evidence.[8] If the attorney representing the state intends to introduce an extraneous crime or bad act that has not resulted in a final conviction in a court of record or a probated or suspended sentence, notice of that intent is reasonable only if the notice includes the date on which and the county in which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act.....

Tex.Code Crim. Proc. Ann. art. 37.07, § (3)(g) (Vernon Supp.2003).

█ The trial court has broad discretion to admit or exclude extraneous-offense evidence. *See Brooks v. State,* 76 S.W.3d 426, 435 (Tex.App.-Houston [14th Dist.] 2002, no pet.) (applying this standard to admission of extraneous-offense evidence over objection based on article 37.07, section 3(g)'s notice requirements).

---

8. Rule 404(b) requires that "reasonable notice" be given "in advance of trial." Tex.R. Evid. 404(b).

The State's article 37.07 notice indicated that Officer Corley would testify that appellant had assaulted him in 1997. Before the second day of punishment testimony began, appellant moved to exclude part of Officer Corley's testimony. Appellant argued that the State had revealed only the day before that the officer would also testify to an uncharged extraneous offense by appellant that the officer was trying to stop when appellant assaulted the officer.[9] The trial court reluctantly ruled that the officer could testify because the State had not learned about the uncharged extraneous offense until shortly before the State notified defense counsel, but the court also ruled that appellant could question the officer about the uncharged offense for 20 minutes before testimony began. The trial court overruled appellant's motion.[10]

■ The State argues that appellant waived this challenge for having cited Rule of Evidence 404 below, rather than article 37.07, section (3)(g). In citing rule 404(b), appellant misspoke the rule on which he was relying, although his mistake is understandable, given that article 37.07, section (3)(g) refers to rule 404(b). Nevertheless, appellant also cited the substance of article 37.07, section (3)(g), and it is clear that the trial court understood that appellant was speaking of article 37.07 notice. *See* TEX. R.APP. P. 33.1(a)(1)(A) (requiring only that objection be stated with "sufficient specificity to make the trial court aware of the complaint...."). Accordingly, appellant did not waive this challenge.

■ If the admission of this testimony was error, we hold that that error was harmless. Error in admitting evidence with insufficient notice under article 37.07, section 3(g) is non-constitutional error. *See Roethel v. State,* 80 S.W.3d 276, 281 (Tex. App.-Austin 2002, no pet.) (concluding that error in admitting extraneous-offense evidence over objection based on article 37.07, section 3(g)'s notice requirement is subject to rule 44.2(b) harmless-error analysis); *accord Brooks,* 76 S.W.3d at 435 (same). We must disregard any such error that does not affect a substantial right. TEX. R.APP. P. 44.2(b). An error affects a defendant's substantial rights when the error had a substantial and injurious effect or influence on the jury's verdict. *King v. State,* 953 S.W.2d 266, 271 (Tex.Crim.App. 1997). If the error had no or only a slight influence on the verdict, the error is harmless. *See Johnson v. State,* 967 S.W.2d 410, 417 (Tex.Crim.App.1998).

■ The statute's purpose is to avoid unfair surprise and to enable the defendant to prepare to answer the extraneous-offense evidence. *See Roethel,* 80 S.W.3d at 282; *Nance v. State,* 946 S.W.2d 490, 493 (Tex.App.-Fort Worth 1997, pet. ref'd). To determine harm in light of that purpose, we analyze whether and how the notice deficiency affected appellant's ability to prepare for the evidence. *Roethel,* 80 S.W.3d at 281–82. The Austin Court of Appeals has stated the test as follows: the appellate court examines the record to determine whether the deficient notice "resulted from prosecutorial bad faith" or "prevented the defendant from preparing for trial," the latter inquiry including whether the defendant was surprised by the substance of the evidence and whether the lack of notice affected his ability to

---

9.  The uncharged offense was an assault or robbery.

10. Both the trial court and appellant referred to appellant's motion once as an in limine motion, but the trial court did not treat the motion this way. Rather, the trial court clearly ruled that the evidence was admissible and then allowed the officer to testify to the complained-of extraneous offense almost immediately after the hearing had taken place.

prepare cross-examination or mitigating evidence. *Id.* at 282.

The trial court noted that the State had itself discovered the complained-of extraneous offense only "very recently" before the second day of the punishment phase, and the State appears to have told appellant's counsel of the offense soon afterwards, within a day of Officer Corley's testifying. The trial court thus seems to have concluded that the State did not act in bad faith, and nothing suggests otherwise. Additionally, the trial court tried to mitigate any surprise by giving defense counsel 20 minutes to interview Officer Corley before testimony began. Defense counsel did not request more time at the end of those 20 minutes, and nothing suggests that the 20 minute allowance did not suffice for counsel to prepare cross-examination.[11] Moreover, when appellant later took the stand, he discussed the complained-of event and admitted his presence at the scene, but he claimed that others with him had attacked the victim.[12] Nothing shows that appellant was surprised by or unable to defend against Officer Corley's different version of those events.

Nor can we conclude that the complained-of testimony was harmful in any other way. The crime was particularly violent, and the victim was an elderly man. The jury had already heard Jimenez testify during punishment that appellant had robbed Jimenez twice before. The jury also heard that appellant assaulted Officer Corley and that appellant attacked or resisted other police officers and tried to strangle a police dog during the same incident. Furthermore, another officer who was present when appellant assaulted Officer Corley testified that he was called to the scene to assist in apprehending two fleeing suspects. Therefore, although the jury did not know from this officer's testimony whether appellant had *actually* committed another crime just before assaulting Officer Corley, the jury knew at least that appellant was at that time a suspect in another crime. Moreover, the jury could surmise that appellant had done something wrong before attacking Officer Corley because, when a uniformed Officer Corley approached appellant, appellant fled and then violently resisted arrest. Finally, against the advice of counsel, appellant took the stand and, on cross-examination, contradicted himself repeatedly and finally admitted to the charged offense, to having hit Jimenez on at least one prior occasion, and to the assault on Officer Corley and the attack on the police dog. Even having these matters before it, the jury assessed punishment at 35 years in prison, far less than the maximum prison time of 99 years or life. *See* TEX. PEN.CODE ANN. § 12.32(a), (b) (establishing punishment range of five to 99 years or life, plus maximum fine of $10,000).

Given these considerations, we cannot say that the admission of the complained-of extraneous offense, if error, had a substantial and injurious effect or influence on the verdict. *See King,* 953 S.W.2d at 271.

We overrule issue three.

**11.** Defense counsel's cross-examination of Officer Corley concerning the complained-of offense was very brief, but then so was counsel's entire cross-examination of Officer Corley, including the cross-examination concerning the extraneous offense of which appellant had notice. Additionally, before he interviewed Officer Corley outside the jury's presence, defense counsel noted on the record that he had already spoken to his client about the offense.

**12.** The record is clear that appellant chose to testify simply to prove his eligibility for probation, not, for example, because he felt compelled to respond to the complained-of testimony.

## C. Ineffective Assistance of Counsel

In issue five, appellant claims that his trial counsel was ineffective for failing to object to the trial court's statement to the venire panel, when explaining the indictment, that "[a] complainant is just a legal word for victim." Appellant claims that the reference was an improper comment on the evidence, allegedly conveying that the trial court believed that Jimenez was "a victim at appellant's hand."

To prove ineffective assistance, a defendant must show, by a preponderance of the evidence, that (1) counsel's performance was so deficient that he was not functioning as acceptable counsel under the Sixth Amendment and (2) there is a reasonable probability that, but for counsel's error or omission, the result of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687–96, 104 S.Ct. 2052, 2064–69, 80 L.Ed.2d 674 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex.Crim.App.1999). The defendant must overcome the strong presumption that the challenged action might have been sound trial strategy. *Thompson*, 9 S.W.3d at 813. We will normally not speculate to find trial counsel ineffective when the record is silent as to counsel's reasoning or strategy. *Gamble v. State*, 916 S.W.2d 92, 93 (Tex.App.-Houston [1st Dist.] 1996, no pet.).

Assuming without deciding that the trial court's statement was error, nothing in the record shows counsel's reasons for not objecting. Holding trial counsel ineffective on this record would require us to speculate, which we decline to do. *See Id.*

Accordingly, we overrule issue five.

## D. Excited–Utterance Exception to the Hearsay Rule

In part of issue two, appellant claims that the trial court erred in allowing Juliet to testify, under the excited-utterance exception to the hearsay rule, to what Jimenez had told her four days after the attack.

A trial court has broad discretion in determining whether evidence is admissible as an exception to the hearsay exclusionary rule. *See Zuliani*, 97 S.W.3d at 595; *Kubin v. State*, 868 S.W.2d 394, 396 (Tex.App.-Houston [1st Dist.] 1993, pet. ref'd).

An excited utterance is a statement that relates to a startling event or condition and that is made while the declarant is under the stress of excitement caused by the event or condition. Tex.R. Evid. 803(2). An excited utterance is not subject to the exclusionary rule applicable to other hearsay. *See* Tex.R. Evid. 803. "The basis for the excited utterance exception is 'a psychological one, namely, the fact that when a man is in the instant grip of violent emotion, excitement or pain, he ordinarily loses the capacity for *reflection* necessary to the fabrication of a falsehood and the "truth will come out." ' " *Zuliani*, 97 S.W.3d at 595 (emphasis added in *Zuliani*) (quoting *Evans v. State*, 480 S.W.2d 387, 389 (Tex.Crim.App.1972)). That is, "the statement is trustworthy because it represents an event speaking through the person rather than the person speaking about the event." *Id.* Accordingly, "the critical determination is 'whether the declarant was still dominated by the emotions, excitement, fear, or pain of the event' or condition at the time of the statement." *Id.* at 596 (citing *McFarland v. State*, 845 S.W.2d 824, 846 (Tex.Crim.App. 1992)). The length of time between the occurrence and the statement, and whether the statement was made in response to questioning, are only factors to consider and are not necessarily dispositive. *Id.* at 595–96.

Jimenez was attacked on a Friday. Although Juliet visited him each day that he was in the hospital, Jimenez was either having surgery, heavily medicated, unconscious, or incoherent through the Monday following the assault. The first day that Jimenez could communicate coherently with Juliet was Tuesday, August 21, four days after the attack. In that very first conversation with her, in which Jimenez described the attack, Juliet said that, in contrast to his usually calm demeanor, Jimenez appeared "mad," he was "excited" because he had gotten "even with" his attackers, he made hand gestures, and he spoke in a "loud" voice. It was unusual for her father to be that upset or excited. Although Juliet did not know if anyone else had spoken to her father before she did, he spoke no English, and she believed that she was the first person who had spoken to him in Filipino about the attack.

Relying on *Gay v. State*, 981 S.W.2d 864 (Tex.App.-Houston [1st Dist.] 1998, pet. ref'd), appellant argues that four days is simply too long a time between the exciting event and the statement for the latter to be an excited utterance. *See id.* at 867 (holding no excited utterance because declarant most likely deliberated about the offense during 10–day lapse). Relying further on *Mosley v. State*, 960 S.W.2d 200 (Tex.App.-Corpus Christi 1997, no pet.), appellant argues that the excitement experienced by the declarant must be continuous between the event and the statement describing it to qualify as an excited utterance. *See id.* at 204 (holding no excited utterance because a number of days had passed with no indication declarant remained in the requisite state of agitation or shock).

This case raises the interesting question of whether the excitement flowing from an event might be interrupted by circumstances that do not allow for deliberation or fabrication, yet perhaps last a substantial period of time before a statement, and that still allow the statement to meet the reliability requirement for an excited utterance. In other words, can there ever be a "suspended excitement" or "suspended animation" variant of the excited-utterance hearsay exception and, if so, under what circumstances? We look to the underlying theory of the rule for the answer. As we stated in *Gay*, "The theory of this exception is simply that circumstances may produce a condition of excitement that temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." *Gay*, 981 S.W.2d at 867 (quoting S. GOODE, O. WELLBORN & M. SHARLOT, GUIDE TO THE TEXAS RULES OF EVIDENCE § 803.3, at 131 (1988)). The basic theory is stated in terms of stilling the capacity for reflection, rather than assuring temporal continuity of the excitement between the event and the statement under all circumstances.

Appellant's argument that the excitement experienced by the declarant must always be continuous between the event itself and the statement describing the event is supported only by the authority that he cites. *See Mosley*, 960 S.W.2d at 204. Yet, the statement from *Mosley* on which appellant relies was unnecessary to the decision and was unsupported by any authority. That statement nevertheless appears to be the basis for the following statement from a leading evidence treatise: "Thus, the declarant's excitement must be continuous between the event itself and the making of the statement." *See* CATHLEEN C. HERASIMCHUK, TEXAS RULES OF EVIDENCE HANDBOOK art. VIII at 784 (4th ed.2001). However, the full context of the statement in that treatise is as follows:

According to the federal drafters, "the theory of Exception (2) [excited utterance] is simply that circumstances may

produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." While this theory has been questioned because the same excitement that enhances sincerity is apt to diminish the faculties of perception and communication, it has achieved sufficient acceptance over the years in courts to be, as a practical matter, beyond the reach of criticism.

The excited utterance exception has three requirements: an exciting event must have occurred; the statement must have been a spontaneous reaction to the event; and the statement must relate to the event. The purpose of the relationship requirement is to ensure that the statement is truly spontaneous and not the result of reflection, which could inject such factors as self-interest, anger, or vindictiveness into the utterance. That purpose is not fulfilled if the statement is not related to the startling event. Therefore, the declarant's statement must be more than just the result of, or caused by, the startling event.

There is no single, rigid principle governing the three requirements; rather, the inquiry is whether the cumulative effect of the three requirements, taken together, is sufficient to show the reliability of the statement. The single most critical factor is whether the declarant made the statement while dominated by the emotion of the startling event or condition. *While the time lapse between the startling event and the statement is not dispositive,* **it is the lack of opportunity to reflect or fabricate details that gives the exception its reliability.** *Thus, the declarant's excitement must be continuous between the event itself and the making of the statement.*

*Id.* at 782–84 (citations omitted, emphasis added).

▮▮▮▮ Although continuity of excitement between the event itself and the making of the statement is one way to assure reliability by forestalling opportunity to reflect or fabricate, another obvious way is unconsciousness. One can scarcely reflect or fabricate while unconscious, yet unconsciousness breaks the continuity of excitement experienced during the event. Accordingly, we hold that the underlying theory of an excited utterance's reliability—inability to reflect or fabricate—is the principle to apply, rather than a rigid requirement that the excitement be continuous under all circumstances. Because the federal and Texas rules regarding the excited-utterance hearsay exception are identical, further support for our holding is found in a leading treatise on the Federal Rules of Evidence: "Physical factors, such as shock, unconsciousness, or pain, may prolong the period during which the risk of fabrication is reduced to an acceptable minimum." WEINSTEIN'S FEDERAL EVIDENCE (2d ed.2003) § 803.04[5], p. 803–26. Therefore, while the declarant's excitement is *ordinarily* continuous between the event itself and the making of the statement, it is too strong to say that the excitement *must always be* continuous. We thus disagree with the *dictum* in *Mosley* that the excitement must be continuous.

▮▮▮ From the evidence in this case, the trial court could have reasonably concluded that Jimenez had not been able to reflect or fabricate and was still upset and under the excitement and stress of the event when he spoke, even though it was four days after the attack, because he had not been coherent enough to speak—or perhaps even to think—about the violent incident until then.[13] The cases on which

13. We acknowledge that this is a close ques-    tion. It likely would not have been an abuse

appellant relies to support the argument that Jimenez "had [the] opportunity to fabricate the statement" because of the time lapse are distinguishable because the declarants in those cases had the opportunity to reflect or fabricate during the periods between the event and the statement.[14] In this case, there was evidence that Jimenez was in surgery, unconscious, heavily medicated, or incoherent through the very day that he made the statement. The trial court thus could have reasonably concluded that, given the circumstances, Jimenez did not have the opportunity to fabricate his statement.

We overrule this portion of issue two.

### E. Rule 403

In the remainder of issue two, appellant argues that the trial court should have instructed the jury to disregard a portion of Juliet's testimony and precluded her from testifying further on the topic under Rule of Evidence 403. *See* Tex.R. Evid. 403.

A trial court may exclude evidence under rule 403 if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice, confusion of the issues, the potential to mislead the

jury, or considerations of undue delay or needless presentation of cumulative evidence. *Id.* We review the trial court's rule–403 ruling for an abuse of discretion. *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Crim.App.2001).

After the trial court had overruled appellant's hearsay objection, the State asked Juliet how her father had explained his injury to her. Apparently surprising everyone, Juliet responded:

> He told me, because I asked him, I said what happened to you? And he says they robbed me again. I said who? You know. And then he says, the people that did it to me before.

The trial court immediately held a hearing outside the jury's presence to consider the testimony's admissibility. The State argued that the testimony was admissible to show identity because Jimenez's senility and poor eyesight affected his ability to identify appellant in court. Appellant responded that the State did not need the extraneous-offense testimony because the jury already knew that Jimenez had identified appellant in a photographic array and had already witnessed the in-court identifications. The trial court agreed with the State, commenting:

of discretion for the trial court to have excluded the statement here, if the trial court had concluded, for example, that there was opportunity to reflect or fabricate. *See Dams v. State*, 872 S.W.2d 325, 329 (Tex.App.-Beaumont 1994, no pet.) (finding no error to exclude statement of defendant to nurse upon awaking in the intensive care unit on the basis that it was not the first time defendant regained consciousness and there was no evidence defendant was excited); *Parks v. State*, 843 S.W.2d 693, 697–98 (Tex.App.-Corpus Christi 1992, pet. ref'd) (finding no error to exclude statement of defendant to his mother on the basis of six hours having elapsed and intervening circumstances, which included being taken to the hospital, sedated, operated on to remove a bullet, and spending time in

the recovery room). The *Parks* opinion also makes no mention of excitement on the part of the defendant at the time he made the statement. *Id.* Nevertheless, although a close question, the trial court's action here was within the zone of reasonable disagreement, so as to require us to uphold its decision. *See Salazar v. State*, 38 S.W.3d 141, 153–54 (Tex. Crim.App.2001).

**14.** *See Aguilera v. State*, 75 S.W.3d 60, 67–68 (Tex.App.-San Antonio 2002, pet. ref'd) (one-year lapse); *Gay v. State*, 981 S.W.2d 864, 867 (Tex.App.-Houston [1st Dist.] 1998, pet. ref'd) (10 day lapse); *Mosley v. State*, 960 S.W.2d 200, 204 (Tex.App.-Corpus Christi 1997, no pet.) ("a number of days").

[S]ince it's hard to tell exactly what happened from the cold record, let me just note that the complainant was a very weak, weak witness. He is very elderly and very feeble, and he had a great deal of . . . of difficulty expressing himself even through the interpreter. And when he walked around the courtroom [when asked if he saw his attacker] and looked at everybody, he looked at the students in the audience a long time. For example, as he passed behind the lawyers, he was—there was a large group of students here and he looked at every one of them as best he could. The man doesn't see very well. And then he came over and passed by the defendant and didn't show any sign of recognition. And then after he came the rest of the way around and got back on the witness stand, he did point out the defendant and accurately made signs showing . . . it was clear he did identify the defendant. However, there is so much in the record indicating that his eyesight is so terrible that the complainant himself, I think made a weak—although the actual pointing was very strong, everything leading up to that indicated that the man would have difficulty identifying anybody. . . . [T]he complainant because of his eyesight problems, kind of—he was just so weak that it seems inherently unfair to me not to let the State explain why he was able to pick him out in spite of his bad eyesight. Having watched the complainant's demeanor, it just seems to me that the fair thing to do is to let—I don't see how the man could possibly have identified [appellant] if he hadn't seen [appellant] on these other occasions. . . .

Accordingly, the trial court refused to instruct the jury to disregard Juliet's testimony. However, granting appellant's request in part, the trial court ruled that the State could elicit only the fact that Jime-

nez recognized appellant from the previous offenses, but could not elicit the substance of the offenses, which could be "very prejudicial and not probative."

On appeal, appellant argues that "the fact that [Jimenez] had already identified the appellant" as his attacker "was not disputed" because appellant "did not contest the admissibility of the photospread nor of the in-court identification." Although the fact that Jimenez *identified* appellant was undisputed, the trial court could reasonably have believed from this record that the *reliability* of that identification was in serious question. That is, the trial court could have concluded that the testimony's probative value was high for showing how Jimenez recognized appellant. Additionally, the trial court strictly limited the testimony, thus rendering it less prejudicial.

Accordingly, we hold that the trial court did not abuse its discretion in concluding that the prejudicial effect of briefly mentioning these extraneous offenses did not substantially outweigh their probative value for showing identity. *See* Tex.R. Evid. 403.

We overrule issue two in its entirety.

### E. *Brady* Violation

In issue four, appellant claims that the State committed a *Brady* violation by failing to reveal until trial that Jimenez was showing signs of senility. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

In *Brady*, the Supreme Court held that the State's suppressing material evidence favorable to the accused, upon the accused's request for the evidence, denies the accused due process of law under the Fourteenth Amendment of the United States Constitution, irrespective of the

State's good or bad faith in withholding the evidence. *See id.,* 373 U.S. at 86–88, 83 S.Ct. at 1196–97; *see also* U.S. CONST. amend. XIV. Withheld evidence is material if there is a reasonable probability that the proceeding's outcome would have differed had the evidence been disclosed. *United States v. Bagley,* 473 U.S. 667, 681–82, 105 S.Ct. 3375, 3383–84, 87 L.Ed.2d 481 (1985). When the withheld evidence is disclosed during trial, the inquiry is thus whether the defendant was prejudiced by the tardy disclosure. *Yates v. State,* 941 S.W.2d 357, 364 (Tex.App.-Waco 1997, pet. ref'd) (quoting *Palmer v. State,* 902 S.W.2d 561, 565 (Tex.App.-Houston [1st Dist.] 1995, no pet.)).

During Juliet's testimony, outside the jury's presence, the State revealed that Jimenez had experienced memory problems since the assault and that "[t]he family believes that there [have] been senility issues." Appellant responded that he was "concern[ed]" because the State had not revealed Jimenez's senility to him before. The trial court understood this as a *Brady* objection. However, appellant asked only that the trial court allow him to question Juliet about Jimenez's senility. The trial court granted this request. When Juliet later testified before the jury that her father had become senile since his hospitalization, appellant chose not to cross-examine her about it.

■ When evidence withheld in violation of *Brady* is disclosed at trial, the defendant's failure to request a continuance waives the error or at least indicates that the delay in receiving the evidence was not truly prejudicial. *See Williams v. State,* 995 S.W.2d 754, 762 (Tex.App.-San Antonio 1999, no pet.) (error waived); *Davis v. State,* 992 S.W.2d 8, 12 (Tex.App.-Houston [1st Dist.] 1996, no pet.) (no prejudice shown); *cf. Wilson v. State,* 7

S.W.3d 136, 146 (Tex.Crim.App.1999) (holding no error in denying defendant's motion for continuance or mistrial, based on *Brady* violation, when motion not made until after both sides had rested cases-in-chief: State had revealed complained-of information five days before testimony began, but defendant did not timely object, thus waiving request). Appellant did not request a continuance. Moreover, the trial court granted appellant the only relief that appellant requested. Accordingly, even if the State violated *Brady,* appellant either waived that error or did not show that the error prejudiced him.

We overrule issue four.

**Conclusion**

We affirm the judgment of the trial court.

Justice JENNINGS, dissenting from the denial of en banc consideration, joined by Justice HEDGES.

JENNINGS, Justice, dissenting from denial of en banc review.

Our rule prohibiting the admission of hearsay evidence [1] is a bulwark of the rule of law, protecting the fair administration of justice and the integrity of our courts. The hearsay rule is an essential component of American jurisprudence, and it helps to insure public confidence in the most important decisions made in our courtrooms—those made by juries. Hearsay evidence is inherently unreliable; it is a deceptive commodity, and, when properly objected to, has no place in a courtroom. Because the panel opinion in this case erodes the hearsay rule, I respectfully dissent from the denial of en banc review.

The panel's holding that the trial court did not abuse its discretion in admitting, as

1. TEX. R. EVID. 802.

an excited utterance, a statement made by the declarant after he had undergone surgery, had been sedated, and had been in and out of consciousness, some four days after the event, is *truly extraordinary* and is in direct conflict with the express language of Rule 803(2) and its stated purpose. *See* TEX. R. EVID. 803(2).

The panel opinion cites no other case in this State, or in the United States, allowing a statement made under these or similar circumstances into evidence as an excited utterance. In fact, one Texas court has held that a trial court did not abuse its discretion in refusing to admit a statement, as an excited utterance, made under similar circumstances. *Parks v. State*, 843 S.W.2d 693, 697–98 (Tex.App.—Corpus Christi 1992, pet. ref'd). Another Texas court, in an unpublished opinion, held that a trial court abused its discretion in admitting a statement, as an excited utterance, made under similar circumstances. *Ytuarte v. State*, No. 09–01–00068–CR, 2002 WL 31322769, at *4 (Tex.App.—Beaumont October 16, 2002, pet. dism'd, untimely filed) (not designated for publication). The *Ytuarte* court noted that the statements in question were made after "a lengthy lapse of time," during which the declarant sought medical treatment and was "treated and sedated." *Id.* That court held:

> We conclude [the declarant] was not "dominated by the emotion, excitement, fear, or pain of the occurrence" when the statements were made. *This conclusion is not within the zone of reasonable disagreement and the trial court's admission of the hearsay evidence constituted an abuse of discretion.*

*Id.* (emphasis added).

### Facts

The facts in regard to this issue are simple. As noted in the panel opinion:

> [The declarant] was attacked on a Friday. Although [his daughter] visited him each day that he was in the hospital, [the declarant] was either having surgery, heavily medicated, unconscious, or incoherent through the Monday following the assault.

On Tuesday, the declarant, who "appeared 'mad,' [and] 'excited' " described the attack to his daughter.

### Excited Utterance

The panel opinion frames the issue as follows:

> This case raises the interesting question of whether the excitement flowing from an event might be interrupted by circumstances not allowing for deliberation or fabrication, yet perhaps *lasting a substantial period of time before a statement,* and still allowing the statement to meet the reliability requirement for an excited utterance. In other words, can there ever be a *"suspended excitement"* or *"suspended animation" variant* of the excited-utterance hearsay exception and, if so, under what circumstances?

(Emphasis added.) The panel holds:

> [W]e hold that the underlying theory of an excited utterance's reliability—inability to reflect or fabricate—is the principle to apply, rather than a rigid requirement that the excitement be continuous under all circumstances.... Therefore, while the declarant's excitement is *ordinarily* continuous between the event itself and the making of the statement, *it is too strong to say that the excitement must always be continuous.*

(Emphasis added.)

However, an excited utterance, an exception to the hearsay rule, is expressly defined as:·

> A statement relating to a startling event or condition *made while* the declarant

was *under the stress of excitement* caused by the event or condition.

TEX. R. EVID. 803(2) (emphasis added). The rule, in direct and unmistakable terms, unambiguously requires that "the declarant's excitement *must be continuous between the event itself and the making of the statement.*" CATHLEEN C. HERASIMCHUK, TEXAS RULES OF EVIDENCE HANDBOOK Art. VIII at 784 (4th ed.2001) (emphasis added). It is the state of the excitement and the fact that a statement is made in the uninterrupted duration of the state of excitement that makes such a statement reliable.

The excited utterance exception "has three requirements: an exciting event must have occurred; the statement must have been a spontaneous reaction to the event; and the statement must relate to the event." *Id.* at 782–83. There is no single, rigid principle governing these three requirements. *Id.* at 783. However,

> [t]he *single most critical factor* is whether the declarant made the statement *while dominated by the emotion* of the startling event or condition. While the time lapse between the startling event and the statement is not dispositive, it is the lack of opportunity to reflect or fabricate details that gives the exception its reliability. Thus, the declarant's excitement *must be continuous between the event itself and the making of the statement.*

*Id.* at 783–84 (emphasis added).

The Federal Advisory Committee's Note regarding Federal Rule 803(2) states that the underlying "theory" behind Rule 803(2) is "simply that circumstances may produce a condition of excitement which temporarily stills the capacity of reflection and produces utterances free of conscious fabrication." FED. R. EVID. 803(2) advisory committee's note. The Note states that there are no pat answers to the question, "How long can excitement prevail?" *Id.* However, it provides that "the standard of measurement is *the duration of the state of excitement.*" *Id.* (emphasis added).

The Court of Criminal Appeals has noted that the basis for the excited utterance exception is "a psychological one, namely, the fact that when a man is in the *instant grip of violent emotion, excitement or pain,* he ordinarily loses the capacity for reflection necessary to the fabrication of a falsehood and the 'truth will come out.'" *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex. Crim.App.2003) (quoting *Evans v. State,* 480 S.W.2d 387, 389 (Tex.Crim.App.1972)) (emphasis added). The statement is deemed reliable "because it represents an event speaking through the person rather than the person speaking about the event." *Zuliani,* 97 S.W.3d at 595. Thus, *"the critical determination* is 'whether the declarant was *still dominated* by the emotions, excitement, fear, or pain of the event' or condition *at the time of the statement."* *Id.* at 596 (citing *McFarland v. State,* 845 S.W.2d 824, 846 (Tex.Crim.App. 1992)) (emphasis added).

Here, the record reveals that, after the robbery, the declarant was taken to the hospital, was in surgery, and was then heavily sedated until he made the statements at issue, four days after the robbery. He was often unconscious during this time period. He not only underwent the intervening event of surgery, but was, in fact, so heavily sedated that he could not communicate with his daughter until four days after the event.

The panel opinion acknowledges that the complainant's excitement was not *"continuous between the event itself and the making of the statement."* Indeed, to my knowledge, this is the first court in the United States to ever hold that the excitement contemplated by Rule 803(2) *need not be continuous* and to recognize a

" 'suspended excitement' or 'suspended animation' variant" of the excited utterance exception to the hearsay rule.

The panel opinion fails to recognize, under the facts and its " 'suspended animation' variant," that it is logically impossible that the declarant was in the "instant grip of violent emotion" caused by the robbery when he made the statements at issue. The declarant's state of "suspended excitement" logically precludes the possibility that his statements were "made while [he] was under the stress of excitement caused by the event." TEX. R. EVID. 803(2). The fact that the state of excitement is in anyway "suspended" means that it has concluded for purposes of Rule 803(2).

Of course, human anger and excitement can come and go and then come back again. However, Rule 803(2) was not designed to cover such circumstances. Again, the declarant, as evidenced by the record, was heavily medicated for four days. It seems axiomatic that the declarant could not, while sedated, unconscious, or both, have been in a "condition of excitement" caused by the robbery. The declarant's original state of excitement caused by the robbery ceased when he was sedated. The fact that he recovered from surgery and was subsequently "mad" and "excited" does not make his statements excited utterances under Rule 803(2). Moreover, it seems readily apparent that heavy sedation could have influenced the complainant's thought processes, removing any inference of reliability, which is the basis of Rule 803(2).

## Conclusion

The " 'suspended excitement' or 'suspended animation' variant" of the excited utterance exception to the hearsay rule is wholly a creature of the panel opinion. The State did not ask for it, and, to my knowledge, no other court in this country has recognized it. The approach taken in the panel opinion marks a gross deviation from the core function of an intermediate appellate court—error correction. Rather than correct the error committed by the trial court, the panel opinion raises far more questions than it answers. Instead of clarifying Rule 803(2), it will actually encourage more litigation over its meaning.

Here, because the declarant's excitement was simply not *continuous between the event itself and the making of his statement,* the trial court abused its discretion in admitting the statement as an excited utterance. Although *Ytuarte* is unpublished, it is on point, and its reasoning is sound. This court should follow the reasoning of *Ytuarte* and also conclude that the declarant in this case was simply not " 'dominated by the emotion, excitement, fear, or pain of the occurrence' when the statements were made." *Ytuarte,* at *4. This court should also hold that this conclusion "is not within the zone of reasonable disagreement and that the trial court's admission of the hearsay evidence constituted an abuse of discretion." *Id.*

The panel opinion is of particular concern in light of the trial court's conclusion that the declarant, the complainant in the case, was a "very weak, weak witness. . . . very feeble." No litigant, criminal or civil, should be subject to a jury verdict based almost entirely upon properly objected-to hearsay evidence, especially when the declarant is "very feeble." The panel opinion is in serious error, sets a precedent that erodes the hearsay rule in this district, and will encourage abuse of Rule 803(2) by both civil and criminal litigants. Thus, en banc consideration of the panel's opinion is required. *See* TEX. R. APP P. 41.2(c).