In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-05-00141-CV
______________________________


CITY OF MARSHALL, TEXAS, Appellant
 
V.
 
JASON MCBRIDE AND CHRISTI MCBRIDE, INDIVIDUALLY AND AS 
 NEXT FRIEND OF LEVI MCBRIDE, Appellees


                                              

On Appeal from the County Court at Law
Harrison County, Texas
Trial Court No. 2004-6551-CCL


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Memorandum Opinion by Chief Justice Morriss


MEMORANDUM OPINION
            The City of Marshall, Texas, appellant, appealed the trial court's denial of its plea to the
jurisdiction in this suit brought by Jason McBride and Christi McBride, individually and as next
friend of Levi McBride. The parties have filed with this Court a joint motion to dismiss this appeal,
which motion has been signed by the attorney for each party.
            Pursuant to Rule 42.1(a)(2) of the Texas Rules of Appellate Procedure, we grant the agreed
motion to dismiss. See Tex. R. App. P. 42.1(a)(2). Further, based on the parties' agreement, we set
aside the trial court's judgment without regard to the merits and remand the case to the trial court for
rendition of judgment in accordance with the agreement. See Tex. R. App. P. 42.1(a)(2)(B). 
Pursuant to the parties' agreement, the City of Marshall shall bear the costs of the appeal.
            We dismiss the appeal.


                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:          January 18, 2006
Date Decided:             January 19, 2006



is a natural
phenomenon that is exaggerated through the use of alcohol and certain other drugs; identification
of four out of six clues serves as a reliable indicator of intoxication and can be used by the officer
in determining whether to make an arrest. DWI Detection Manual, supra, at VIII-3, -8; see
Emerson, 880 S.W.2d at 768 ("The scientific materials addressing the issue have reached the uniform
conclusion that the consumption of alcohol has a cognizable effect on human eye movement . . .
the accuracy of those sources cannot be reasonably questioned.").

In determining whether a person's performance of the HGN test suggests intoxication, an
officer must look for the following clues in each eye: (1) the lack of smooth pursuit, (2) distinct
nystagmus at maximum deviation, and (3) the onset of nystagmus prior to forty-five degrees. DWI
Detection Manual, supra, at VIII-6. In other words, if the person's eyes fail to smoothly follow
a stimulus across the field of vision, exhibit nystagmus when held as far to the side as possible, or
display nystagmus at an angle prior to forty-five degrees from looking straight ahead, each will be
considered a clue indicating possible intoxication. Baggett testified at trial that Compton exhibited
five out of six clues; both eyes lacked smooth pursuit and displayed nystagmus at maximum
deviation, while one eye showed signs of nystagmus prior to forty-five degrees. 

Compton's principal argument against allowing the results of the HGN test to be introduced
into evidence is that Baggett failed to follow precisely the DWI Detection Manual's instructions for
administering both the smooth pursuit and maximum deviation portions of the test. Specifically,
Compton contends that Baggett administered the test too quickly and that, by moving the stimulus
within the field of vision and holding the eyes at maximum deviation for less time than procedure
recommends, the results of the test were rendered unreliable under Emerson and should not have
been considered. Even if Compton's estimate of the time it took for Baggett to perform these tests
was accurate, the difference between the time recommended and Compton's estimate is negligible.

The DWI Detection Manual's prefatory language acknowledges that although the tests, when
administered under ideal conditions, "will generally serve as valid and useful indicators of
impairment," slight variations from the ideal "may have some affect [sic] on the evidentiary weight
given to the results." Preface to DWI Detection Manual, supra. The Texas Court of Criminal
Appeals also notes that "[t]he accuracy of the HGN test has been estimated at various levels,
depending on such factors as testing conditions and the ability and experience of those conducting
the test," thus taking into account that the test will not be administered in strict conformity with an
officer's training every time it is performed. Emerson, 880 S.W.2d at 767. It would be unreasonable
to conclude that any variation in administering the tests, no matter how slight, could automatically
undermine the admissibility of an individual's poor performance of the tests.

Compton complains that Baggett administered the smooth pursuit portion of the HGN test
in eleven seconds instead of the sixteen seconds prescribed in the DWI Detection Manual (i.e.,
Baggett moved the stimulus two and a half seconds faster than recommended for each eye). The
manual itself only provides approximations of the time required for properly conducting the tests;
however, Compton reasons that the slightly increased speed with which Baggett administered the
test amounted to an inappropriate application of the technique, invalidating the results. This
conclusion is untenable and, if accepted, would effectively negate the usefulness of the tests entirely. 
Any variation in timing would require courts to exclude the results as unreliable.

Considering the maximum deviation portion of the HGN test, the DWI Detection Manual
indicates that an individual's eye should be kept at maximum deviation, or as far to the side as
possible, for a minimum of four seconds. With each eye being tested twice, Baggett should have
required Compton to maintain his eye position at maximum deviation for the minimum time stated
in the manual-four seconds per test, eight seconds for each eye. DWI Detection Manual, supra,
at VIII-7. The total testing time for nystagmus at maximum deviation, therefore, should require at
least sixteen seconds plus the time necessary to correctly position the eye to be tested. Compton
concedes that Baggett took nineteen seconds to perform this test, but argues that the test should have
taken at least thirty-two seconds-sixteen seconds to test at maximum deviation plus sixteen seconds
to position the eyes. Unlike the test for smooth pursuit, the movement of the eye from side to side
across the field of vision is irrelevant; instead, the test is to observe the eye for distinct nystagmus
in a specific position. Any variation in the time taken to appropriately position the eyes would have
no effect on the reliability of this test and cannot form the basis for excluding the results from the
evidence presented at trial.

 2. One-Legged Stand Test

Another of the tests outlined in the DWI Detection Manual is the one-legged stand test. As
suggested by its name, this test allows an individual to demonstrate his or her ability to remain
balanced while standing on only one leg. DWI Detection Manual, supra, at VIII-12. Failure to
remain balanced during the test or to comply properly with an officer's directions may serve as clues
of intoxication. Although one of the requirements for properly administering the test includes
instructing someone that his or her hands must remain to the side, Baggett's trial testimony clearly
indicated that he failed to do so. Compton subsequently used his hands to help himself balance and,
partially for this reason, performed poorly on this test. We must determine whether the trial court's
admission of the results of the one-legged stand test was harmless.

Under the harmless error standard for nonconstitutional error, we must disregard any error
that does not affect a substantial right. Tex. R. App. P. 44.2(b). "A substantial right is affected when
the error had a substantial and injurious effect or influence in determining the jury's verdict," King
v. State, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing Kotteakos v. United States, 328 U.S.
750, 776 (1946)); however, "[i]f the error had no or only a slight influence on the verdict, the error
is harmless," Apolinar v. State, 106 S.W.3d 407, 414 (Tex. App.-Houston [1st Dist.] 2003, no pet.)
(citing Johnson v. State, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)).

Under the circumstances, even if the trial court's admission of the one-legged stand test
results did influence the jury's verdict, we deem that it "had but a slight effect" and that the admission
was harmless. Johnson, 967 S.W.2d at 417. In fact, Baggett's failure to instruct Compton to keep
his arms at his side should have made the test easier to perform. Even with the use of his arms,
however, Compton swayed from side to side, unable to balance himself on one leg. Baggett testified
that, "even without using his arms to balance, [Compton] still had enough clues on the one-leg stand
to be considered intoxicated." Nevertheless, when viewed in light of the other evidence presented
at trial, the results of the one-legged stand test are relatively insignificant. Baggett's uncontroverted
testimony at trial was that Compton ran a red traffic light; smelled of alcohol; had slurred speech;
admitted drinking two beers; had a cold, open bottle of beer in his truck; and became belligerent
when Baggett placed him under arrest. Compton also demonstrated five out of six clues on the HGN
test, refused to perform the walk-and-turn test, (1) and refused to submit to Intoxilyzer testing. 

B. Legal and Factual SufficiencyCompton contends in his second and third points of error that the evidence presented at trial
was both legally and factually insufficient to support his conviction. In reviewing legal sufficiency,
we view the evidence in the light most favorable to the verdict and determine whether any rational
trier of fact could have found the essential elements of the crime beyond a reasonable doubt. 
Jackson v. Virginia, 443 U.S. 307, 318-19 (1979); King v. State, 29 S.W.3d 556, 562 (Tex. Crim.
App. 2000). When reviewing the factual sufficiency of the elements of an offense, however, we
view all the evidence in a neutral light and "set aside the verdict only if it is so contrary to the
overwhelming weight of the evidence as to be clearly wrong and unjust." Johnson v. State, 23
S.W.3d 1, 6-7 (Tex. Crim. App. 2000) (citing Clewis v. State, 922 S.W.2d 126, 129 (Tex. Crim.
App. 1996)).

Baggett testified he was certified to administer the field sobriety tests, had been updated on
the tests in 2000, and had performed the tests on many occasions. After pulling Compton to the side
of the road for speeding and running a red traffic light, Baggett noticed Compton's slurred speech
and the smell of alcohol on his breath. These factors-in addition to Compton's admitting drinking
two beers and Baggett finding a cold, open beer bottle in the truck-led Baggett to conduct the tests. 
Considering these factors alongside Compton's poor performance of the tests, we conclude there is
sufficient evidence on which a rational trier of fact could have found the essential elements of the
crime of driving while intoxicated.

In reviewing a claim that the evidence at trial was factually insufficient to sustain an
appellant's conviction, we "consider all the evidence in the record . . . comparing the weight of the
evidence that tends to prove guilt with the evidence that tends to disprove it" and "necessarily
consider any reasonable alternative hypothesis raised." Rumage v. State, No. 12-02-00190-CR, 2003
Tex. App. LEXIS 7232, at *9-10 (Tyler Aug. 20, 2003, no pet. h.) (citing Fuentes v. State, 991
S.W.2d 267, 271 (Tex. Crim. App. 1999); Richardson v. State, 973 S.W.2d 384, 387 (Tex.
App.-Dallas 1998, no pet.)). After listening to Baggett's testimony surrounding Compton's stop and
viewing the video recording of Compton's performance of the field sobriety tests, the jury chose to
give less weight to Compton's cross-examination, in which he attempted to discredit the reliability
of the tests as they were administered in this case. We defer to the jury's role as "the sole judge of
the weight and credibility given to witness testimony" and determine that the verdict is not so
contrary to the overwhelming weight of the evidence as to be wrong or unjust. Johnson, 23 S.W.3d
at 6-7.

Conclusion

Because there was no error in the trial court's denial of Compton's motion to suppress
evidence of the HGN test and the admission of the one-legged stand test results was harmless, we
conclude there is both legally and factually sufficient evidence to support the jury's verdict. 

We affirm the judgment of the trial court.


 Josh R. Morriss, III

 Chief Justice


Date Submitted: September 16, 2003

Date Decided: September 18, 2003


Publish
1. Baggett testified that, even while he explained the walk-and-turn test and before Compton
refused to comply, Compton was unable to keep his balance.