NUMBER 13-07-00527-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG


 


SAMUEL RENE GARCIA, Appellant,


v.


THE STATE OF TEXAS, Appellee.

 


On appeal from the 93rd District Court

of Hidalgo County, Texas.

 


MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Yañez and Garza


Memorandum Opinion by Justice Garza



 Appellant, Samuel Rene Garcia, was convicted of murder, a first-degree felony, and
was sentenced to forty-five years in prison. See Tex. Penal Code Ann. § 19.02(b)(1)
(Vernon 2003). By six issues, Garcia argues on appeal that: (1) the evidence was legally
and factually insufficient to support the jury's verdict; (2) the trial court erred in denying his
motion for mistrial; (3) the trial court erred in admitting a video recording and photographs
of the crime scene; (4) the trial court erred in denying his motion to remove a juror for
alleged misconduct; (5) he received ineffective assistance of counsel; and (6) the trial court
erred in admitting into evidence a prior judgment of conviction because the State did not
provide reasonable notice pursuant to the Texas Code of Criminal Procedure. See Tex.
Code Crim. Proc. Ann. art. 37.07, § 3(g) (Vernon Supp. 2009). We affirm.

I. Background

 On October 12, 2005, Gabriela De Leon was found strangled and burned in her
apartment. Garcia was subsequently indicted for her murder. The indictment alleged, in
four paragraphs, that Garcia intentionally and knowingly caused the death of De Leon by
(1) strangling her with a cable, (2) strangling her with his hand, (3) striking her with his hand
or (4) striking her with an unknown object. Garcia admitted to being in De Leon's
apartment on the night of her death, but alleged that she was dead upon his arrival. He
claimed he panicked because, for some unexplained reason, he knew that his fingerprints
would be found on her body. For that reason, he picked up the body, put it in the bedroom
closet and set the body and the contents of the closet on fire. He then took the keys to De
Leon's car and drove it to a vacant lot in Mission, Texas, where it was later found
abandoned. Garcia's theory was that someone else committed the murder. The case was
tried to a jury, and Garcia was found guilty of murder and sentenced to forty-five years'
imprisonment in the Institutional Division of the Texas Department of Criminal Justice. 
Garcia then filed a motion for new trial alleging that his trial counsel provided ineffective
assistance; the trial court denied the motion. This appeal followed.

II. The Evidence

A. Emergency Personnel and Police Testimony

 Vicente Abrigo, a lieutenant with the McAllen Fire Department, testified that he
responded to a fire alarm at an apartment complex in McAllen, Texas, at 12:14 p.m. on
October 12, 2005. Lieutenant Abrigo discovered De Leon's dead and burnt body in one
of the closets of the apartment. (1) Armando Hernandez, a crime scene investigator with the
McAllen Police Department, took photographs of the scene and of De Leon's body. The
photographs were entered into evidence. Investigator Hernandez observed "some type
of either cable cord or some kind of video game cord" wrapped around De Leon's neck
several times. He also noticed: a broken artificial nail on the index finger of De Leon's
right hand; swelling on the right side of her face and right eye, as if she had been
assaulted; abrasions on top of her head; and blood coming out of the side of her mouth. 
Investigator Hernandez assisted in collecting scrapings from underneath the victim's
fingernails. He testified that there was no forced entry into the apartment and that the
interior of the apartment was covered with soot.

 After Garcia was apprehended, Investigator Hernandez saw "what appeared to be
stained blood on [Garcia's] pants and on his shirt[,] . . . scratch marks on his face, scratch
marks on the back of the neck and underneath his lip" and "some bleeding or some small
lacerations to the tip of his fingers." Hernandez assisted in removing Garcia's clothes by
using "pressure point, minimum force which you can use to have the suspect or Defendant
comply with your order." (2) A lighter was found hidden in Garcia's buttocks. The officers
recovered $13.77 from Garcia's left front pocket and $60.10 from his right front pocket. 
His wallet was empty. Garcia's entire left hand and two fingers on his right hand were
swabbed.

 Investigator Hernandez testified that Erik Montemayor Gonzalez was also a person
of interest in De Leon's murder. An oral swab was taken from Gonzalez, but Investigator
Hernandez did not recommend submitting the swab for comparison and analysis to the
Texas Department of Public Safety laboratory.

 Heriberto Vigil, a crime scene investigator with the McAllen Police Department,
testified that when he arrived at the scene of the crime, De Leon's body was outside of the 
apartment on an ambulance stretcher. At that time, he preserved the body and conducted
fingernail scrapings and fingerprinting. He observed an X-Box video game cord tightly
wrapped around De Leon's neck about four times.

 Rene Hernandez, a detective with the McAllen Police Department, was the lead
investigator on the case. He arrived at the scene at approximately 1:00 p.m. and observed
De Leon's body on the stretcher. Detective Hernandez noted that De Leon was partially
burned, her face was swollen, there was blood around her face, and a fingernail was
broken. There was no sign of forced entry into the apartment. Detective Hernandez later
met with Garcia at the police station. While Garcia was still fully clothed, Detective
Hernandez observed scratches on Garcia's face and neck area, blood on his pants and
hands, and noticed that he smelled of smoke. Detective Hernandez also interviewed
Gonzalez, who came in to the station of his own volition. Gonzalez was cooperative and
permitted the detective to look for scratches; none were found.

 Mario Cavazos, a detective with the McAllen Police Department, testified that De
Leon's vehicle was located in a vacant lot near the Cimarron golf course in Mission. After
being assigned to locate Garcia, Detective Cavazos interviewed Janell Garcia, Garcia's
wife, who advised him that Garcia was at a nearby Wal-Mart. When Detective Cavazos
arrived at the Wal-Mart, he saw Garcia pacing in front of the store. Detective Cavazos
apprehended Garcia and immediately smelled smoke on his person. He saw smoke
residue around Garcia's ears and neck and scratches on his face and neck.

 Investigator David Ramos of the McAllen Police Department testified that he was
assigned to contact and canvas the area for witnesses. As part of his duties, Investigator
Ramos obtained De Leon's cell phone records. The records revealed outgoing calls to a
"Mr. Islas" at 3:06 a.m., and two calls to a "Mrs. Briales" at 3:08 a.m. (3) Prior to that, there
were six incoming calls from De Leon's sister, Claudia. There were no calls made after
3:08 a.m.

B. Claudia De Leon

 Claudia De Leon is the victim's older sister. She had worked until approximately
2:00 a.m. that day and came to De Leon's apartment around 2:25 a.m. At that time,
Garcia was in the restroom. According to Claudia, Garcia opened the restroom door,
looked out, didn't say anything, and then returned to the restroom. While Garcia was in
the restroom, Claudia and De Leon talked about how Claudia had just been paid $200 at
work. De Leon mentioned that she had approximately $100 in cash that she was saving
up to pay her electric bill. About ten minutes later, Garcia came out of the restroom. 
Claudia stated that she spoke with Garcia and observed his face--she noticed a pimple
on his nose but did not see any scratches or stains on his clothes. Claudia and De Leon
left the apartment around 2:40 a.m. to go to a nearby convenience store. At that point, De
Leon told Garcia to leave. However, as she drove away from the parking lot with her sister,
Claudia did not see Garcia walking or driving away.

 Later that day, Claudia's mother received a call from police asking for De Leon
because her car had been located in Mission. Because De Leon was not answering her
cell phone, Claudia decided to go to her apartment. Claudia arrived at the apartment
around 11:00 a.m. to find the door unlocked. When she opened the door, smoke came
out. She sought help from a neighbor.

 Claudia was asked to review the photographs of Garcia that were taken at the police
station. She testified that the scratch marks on Garcia's face and neck were not present
when she saw him at the apartment in the early hours of that morning. She also testified
that De Leon was wearing earrings and that her fingernails were intact when she last saw
her alive that morning.

C. Janell Garcia

 Janell was married to Garcia from 1995 to 2006. She and her children were living
with her mother in 2005. Although they were separated, she and Garcia talked every other
day. Janell was employed as a detention officer with the McAllen Police Department and
used the only car that she and Garcia owned. Janell testified that Garcia did not have his
own car or his own place to stay.

 On October 11, 2005, Janell received a call from Garcia around 7:15 a.m., asking
her to pick him up and take him to a Wal-Mart "because he was expecting to get some
money from his sister at the money gram there at Wal-Mart." Janell complied. When
Garcia came out of the Wal-Mart, he said the money he was expecting had not been sent,
and he stated that he needed money to rent a hotel room. Janell next took Garcia to an
apartment complex to see someone that supposedly owed Garcia ten dollars; but that
person was not home. Janell then withdrew sixty dollars from an ATM, gave Garcia forty-five dollars, and dropped him off at a different apartment complex. Later that afternoon,
she picked him up again and they went to their son's football game. When the game
ended around 7:45 p.m., Garcia asked Janell to take him to the McAllen Police Department
so he could turn himself in for some outstanding tickets, thinking he could "do some time
there" since he didn't have a place to stay. Janell complied with his request. Garcia called
again at around 10:00 p.m. and asked Janell to pick him up at a Burger King and drop him
off at the Mint Club where he worked as a bouncer.

 On October 12, 2005, at approximately 4:00 p.m., Garcia called Janell asking her
to pick him up at the Wal-Mart off of Shary Road in Mission. By that time, investigators had
advised Janell that they were looking for her husband. Janell told the investigators the
location from where Garcia had called. The next day, Garcia called Janell as he was being
transported to the county jail. He told her not to let the kids watch the news and asked her
to call his attorney. She testified his voice was normal and that he did not sound worried,
nervous, or emotional.

D. Forensic Evidence

 Jose Zuniga, a forensic scientist with the Texas Department of Public Safety Crime
Laboratory, was asked to screen toothpicks with fingernail scrapings taken from De Leon
and to perform a fiber comparison, if necessary. According to Zuniga, "fibers that were
recovered from the fingernail scrapings can be excluded as having originated from the blue
Polo shirt and the Old Navy jeans" that Garcia was wearing on the night in question.

 Crystal Anderson, a forensic scientist with the serology DNA section of the Texas
Department of Public Safety Crime Laboratory, testified that she processes evidence for
the presence of body fluids and then develops DNA profiles from any stains that are found. 
In this case, Anderson examined the toothpicks with scrapings taken from De Leon's
fingernails, some socks, Garcia's shirt, jeans, and boots, and Garcia's hand swabs. 
Anderson found blood stains in one sock; no blood on the boots; several apparent blood
stains on the blue shirt and blue jeans worn by Garcia; and apparent blood on the hand
swabs.

 Anderson conducted DNA analysis on the toothpicks with De Leon's fingernail
scrapings. Garcia was excluded from both the right-hand and left-hand fingernail
scrapings. The fingernail scrapings from De Leon's right hand were consistent with her
own DNA. The fingernail scrapings from De Leon's left hand were consistent with a
mixture of her DNA and that of an unknown individual. The hand swabs from Garcia's right
and left hand were consistent with his own DNA. A stain from the shoulder area of the shirt
Garcia was wearing was consistent with a mixture of DNA from Garcia and De Leon. De
Leon was excluded from a stain located on another area of the shirt. Of the three socks
that were tested, apparent blood was detected on two of the socks; on those two socks,
the DNA profile developed from all four stains were consistent with De Leon. The DNA
profile obtained from a stain from the front hip area of Garcia's jeans was consistent with
a mixture of DNA from Garcia, De Leon, and an unknown individual.

 Fulgencio Salinas, M.D., a pathologist, performed an autopsy on De Leon on
October 12, 2005. Dr. Salinas examined De Leon's body and observed: abrasions on the
front portion of her forehead; swollen eyelids; a hemorrhage or congestion along her
eyelids; areas of hemorrhaging around the conjunctiva, or inside white of the eyes, which
is usually caused by asphyxia or irritation; a cord wrapped around her neck three or four
times, causing compression around the neck area; and extensive burns on her body. An
internal examination of De Leon's head showed several hematomas, which, according to
Dr. Salinas, is a collection of blood that occurs in the soft tissues and is caused by some
type of blunt trauma. Hematomas were also found on the inside of both lips. De Leon's
brain showed a diffuse subarachnoid hemorrhage, which is caused by trauma or injury to
that area. When Dr. Salinas opened up her larynx, no soot was present, which suggested
that De Leon was not alive during the fire. There were no fractures in the throat. Dr.
Salinas opined that "De Leon died as a result of asphyxia by strangulation and multiple
head trauma that led to the diffuse subarachnoid hemorrhage head trauma and cerebral
edema." In this case, he testified, it was the cord that was wrapped around her neck that
resulted in the asphyxia. A second possible cause of death, according to Dr. Salinas, was
multiple head trauma. The fire did not cause De Leon's death.

E. Alex Alvarez

 Alex Alvarez, an officer with the McAllen Police Department, stated that he
transported Garcia from the police department to the Hidalgo County Jail on October 14,
2005. At some point, Garcia asked to use Officer Alvarez's cell phone to call his wife. 
Officer Alvarez dialed the number and held up the phone for Garcia to talk. While
speaking on the phone, Garcia was crying and

saying he was sorry. He was asking her to go on with her life. He asked her
to find someone that would give her anything that she wished for. He said
that he was sorry and that he would rather put a bullet in his head instead of
going to jail. He referred to this experience as maybe it was a sign from God
because he was tired of living the kind of life he was living.


According to Officer Alvarez, Garcia then said, "I'm sorry, Baby, but they said I killed this
girl and I swear I didn't." After Garcia ended the telephone conversation, he became very
emotional and began crying. Officer Alvarez testified that Garcia

began by saying, "I panicked. I panicked." He was crying, and he kept
saying he panicked. And he said he went inside the house, saw her dead
and he panicked. So he just picked her up, threw her in the closet and lit her
up. As he's saying this, he's crying. . . . He kept saying that, you know, "I
knew they were going to find my fingerprints on her body. So, that's why I
put her in the closet and burned her."


 . . . .


He said that he knew that they were going to find her blood on his clothes
and so that's why the investigators had kept them. . . . He said he had taken
the car--the car keys from the table and driven the car to the Cimarron [sic]
where he left it and then began to walk.


On cross-examination, Alvarez acknowledged that, while Garcia did admit to burning De
Leon's body, he did not admit to killing her.

III. Discussion

A. Evidentiary Sufficiency

 By his first issue, Garcia argues that the evidence at trial was legally and factually
insufficient to support his conviction. (4) Specifically, Garcia argues the evidence was (1)
factually insufficient to show he was the person that caused the death of the victim, and
(2) legally and factually insufficient as to the cause of death.

 In conducting a legal sufficiency review, we consider the evidence in the light most
favorable to the verdict to determine whether any rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. Sanders v. State, 119 S.W.3d
818, 820 (Tex. Crim. App. 2003). We must give deference to "the responsibility of the trier
of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw
reasonable inferences from basic facts to ultimate facts." Hooper v. State, 214 S.W.3d 9,
13 (Tex. Crim. App. 2007) (citing Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). We
are not required to determine whether we believe that the evidence at trial established guilt
beyond a reasonable doubt; rather, when faced with conflicting evidence, we must
presume that the trier of fact resolved any such conflict in favor of the prosecution, and we
must defer to that resolution. State v. Turro, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993).

 In conducting a factual sufficiency review, we consider the evidence in a neutral
light. Watson v. State, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006). The verdict will
be set aside only if (1) it is so contrary to the overwhelming weight of the evidence as to
be clearly wrong and manifestly unjust, or (2) it is against the great weight and
preponderance of the evidence. Id. at 415 (citing Johnson v. State, 23 S.W.3d 1, 10 (Tex.
Crim. App. 2000)).

 The State is not required to present direct evidence, such as eyewitness testimony,
to establish guilt. See Guevara v. State, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004). 
"Circumstantial evidence is as probative as direct evidence in establishing guilt of the actor,
and circumstantial evidence alone can be sufficient to establish guilt." Hooper, 214 S.W.3d
at 13; see Guevara, 152 S.W.3d at 49. The law does not require that each fact "point
directly and independently to the guilt of the appellant, as long as the cumulative effect of
all the incriminating facts is sufficient to support the conviction." Hooper, 214 S.W.3d at
13; see Guevara, 152 S.W.3d at 49.

 Both legal and factual sufficiency are measured by the elements of the offense as
defined by a hypothetically correct jury charge. Malik v. State, 953 S.W.2d 234, 240 (Tex.
Crim. App. 1997); Adi v. State, 94 S.W.3d 124, 131 (Tex. App.-Corpus Christi 2002, pet.
ref'd). Under a hypothetically correct jury charge, Garcia committed the offense of murder
if he (1) intentionally or knowingly (2) caused De Leon's death. See Tex. Penal Code Ann.
§ 19.02(b)(1). A person acts intentionally with respect to a result of his conduct when it is
his conscious objective to cause the result. Id. § 6.03(a) (Vernon 2003). A person acts
knowingly with respect to a result of his conduct when he is aware that his conduct is
reasonably certain to cause the result. Id. § 6.03(b). Intent may "be inferred from
circumstantial evidence[,] such as acts, words, and the conduct of the appellant." 
Guevara, 152 S.W.3d at 50; see also Hart v. State, 89 S.W.3d 61, 64 (Tex. Crim. App.
2002) (stating that a fact-finder may infer both knowledge and intent from the defendant's
acts, words, or conduct and from the nature of the wounds inflicted on the victim);
Ledesma v. State, 677 S.W.2d 529, 531 (Tex. Crim. App. 1984) (noting that the requisite
culpable mental state may be inferred from the surrounding circumstances).

 1. Factual Sufficiency of Evidence that Garcia Caused De Leon's Death

 Garcia claims the evidence is sufficient only to show that he was present at the
scene of the murder. To this end, he admits that he was present, but claims that De Leon
was dead upon his arrival. He claims he panicked and lit the body and the apartment on
fire to destroy evidence of his fingerprints. Garcia argues there is no controverting
evidence.

 Additionally, Garcia argues that the fact that De Leon's DNA was on his clothing
establishes only that he had contact with her at some point in time; something to which he
admits. Further, Garcia notes that Dr. Salinas was not able to say when De Leon died and
whether Garcia was around her at the time of death. Garcia argues that, through cross-examination of the officers, he established that the scratches and red marks on his face
and neck could have been caused by the police officers when they were forcibly removing
his clothes. Finally, Garcia argues, "the proposition that the victim caused the scratch
marks on the Defendant was not plausible because the State's experts concluded that the
DNA found under the victim's fingernails were from an unknown individual."

 While there is no evidence to controvert Garcia's claim that De Leon was dead when
he arrived at the apartment, the jury was free to determine the credibility of Garcia's story. 
It is the jury's sole responsibility to judge the credibility of witnesses, and the jury is free to
believe or disbelieve any portion of a witness's testimony. Cain v. State, 958 S.W.2d 404,
408-09 (Tex. Crim. App. 1997); Ortega v. State, 207 S.W.3d 911, 920 (Tex. App.-Corpus
Christi 2006, no pet.). In addition to Garcia's claim, the jury also heard Claudia's testimony
that Garcia was present at the apartment a short time before De Leon returned to her
apartment at approximately 3:00 a.m. The jury heard testimony that calls were made from
De Leon's cell phone by a male at 3:06 and 3:08 a.m. They learned that Garcia had been
desperately looking for money earlier that day because he had no place to stay. Claudia
testified that she and her sister were talking about money that De Leon had in the
apartment while Garcia was in the restroom.

 The fact that De Leon's DNA was found on Garcia's clothing is equally probative of
his murdering her as it is to his claim that he simply made contact with her. The jury could
have believed that the blood of De Leon, found on Garcia's shirt and pants, resulted from
the process of him killing her rather than from him merely picking her up and putting her
in the closet. Dr. Salinas testified there was no soot in De Leon's throat, which indicated
that she died prior to the fire. The jury could have believed that Garcia killed her first, by
strangling her with the X-Box cord, and that he then placed her in the closet before setting
her body and the other contents of the closet on fire. This would be consistent with the
testimony of Dr. Salinas. Although Garcia established that the scratches and red marks
on his face and neck may have been caused by the officers as his clothes were being
forcibly removed, the jury also heard the testimony of Detective Hernandez, who saw the
scratch marks prior to Garcia's clothes being removed.

 Finally, Garcia asserts that it is not "plausible" that De Leon caused the scratch
marks on Garcia's face and neck, because Garcia's DNA was not found underneath De
Leon's fingernails. However, Garcia presented no testimony, expert or otherwise,
indicating that the lack of his DNA under De Leon's fingernails conclusively established that
the scratches were not made by De Leon. Without such testimony, the jury was free to
weigh the evidence and resolve any conflict therein. See Clayton v. State, 235 S.W.3d
772, 778 (Tex. Crim. App. 2007) ("When the record supports conflicting inferences, we
must presume that the fact[-]finder resolved the conflicts in favor of the prosecution and
therefore defer to that determination.") (citing Jackson, 443 U.S. at 326).

 Considering all of the evidence in a neutral light, we cannot say that the verdict was
clearly wrong, manifestly unjust, or against the great weight and preponderance of the
evidence. See Watson, 204 S.W.3d at 415. Therefore, the evidence was factually
sufficient to support the jury's finding that Garcia caused the death of De Leon.

 2. Legal and Factual Sufficiency of Evidence of De Leon's Cause of Death

 Garcia next argues that the testimony of Dr. Salinas regarding the cause of De
Leon's death was legally and factually insufficient to support the guilty verdict. First, Garcia
criticizes Dr. Salinas for not stating that the blunt trauma he observed on De Leon's body
was "severe." He further complains that Dr. Salinas did not testify as to an approximate
time frame during which this trauma occurred. Garcia states that "[t]he doctor failed to
provide this essential information to the jury wherein they would be able to make a rational
decision based on competent evidence."

 Dr. Salinas testified that he observed several hematomas in the interior of De Leon's
head and on the inside of both of her lips. Her brain showed a diffuse subarachnoid
hemorrhage. While Dr. Salinas may not have used the word "severe," he testified the
hematomas and hemorrhage were caused by blunt force trauma. Implicit in this conclusion
is the notion that the trauma was severe enough to cause these hematomas and
hemorrhage. As to the time frame, it is true that Dr. Salinas did not testify as to when the
trauma may have occurred. Garcia argues "the trauma he observed may have been
caused one week before the death of the victim from some unrelated matter." However,
there was no evidence at trial to support this contention.

 Garcia further complains that Dr. Salinas was unable to pinpoint the time of De
Leon's death and that he "vacillate[d]" regarding the cause of death. Dr. Salinas opined
that "De Leon died as a result of asphyxia by strangulation and multiple head trauma that
led to the diffuse subarachnoid hemorrhage head trauma and cerebral edema." In this
case, he testified, it was the cord that was wrapped around her neck that resulted in the
asphyxia. A second possible cause of death, according to Dr. Salinas, was multiple head
trauma. The jury heard evidence that De Leon was alive at approximately 3:00 a.m. on
October 12, 2005, and that she was found dead at around noon of that day. The jury was
able to infer that De Leon died within that time frame. Garcia does not demonstrate how
the lack of a precise estimate as to time of death renders the opinion of Dr. Salinas
insufficient or incapable of being considered by the jury.

 Finally, Garcia argues "Dr. Salinas never offered any reasonable medical
explanation of how he was able to arrive at his opinions. He did not offer nor reveal the
underlying scientific or medical bases for arriving at such conclusions regarding the cause
of death." In support of this argument, Garcia notably cites case law and rules of evidence
regarding admissibility of scientific evidence. Kelly v. State, 824 S.W.2d 568, 573 (Tex.
Crim. App. 1992); Tex. R. Evid. 702. To the extent that Garcia is arguing that Dr. Salinas's
testimony was inadmissible, we note that an objection at trial is required in order to
preserve an appellate complaint that expert testimony was wrongly admitted. See Tex. R.
App. P. 33.1. Garcia's counsel did not object to Dr. Salinas being called as an expert in the
area of forensic pathology. In fact, prior to the State offering Dr. Salinas as an expert,
Garcia's counsel asked to take him on voir dire and ask questions of him. Upon
completion of his questioning, defense counsel said, "we defer to the court." Garcia's
counsel did not object when the State offered Dr. Salinas as an expert or when Dr. Salinas
expressed his opinions. Accordingly, this complaint is not preserved for our review. See
id.

 We conclude that the evidence regarding De Leon's cause of death was legally and
factually sufficient. Garcia's first issue is overruled.

B. Denial of Motion for Mistrial

 By his second issue, Garcia contends that the trial court committed reversible error
when it denied his motion for mistrial after the State elicited testimony of Garcia's criminal
history during the guilt/innocence phase of the trial. Garcia complains specifically of the
following testimony by Officer Cavazos:

[Prosecutor]: And at that point, were you given a particular
assignment?


[Officer Cavazos]: Yes. Well, we learned that the possible suspect in this
case was Mr. Garcia. And I was provided with a mug
shot photo, and I was informed by fellow investigators
that--of his criminal history and--


[Defense counsel]: Judge, may we approach?


The Court: Yes, you may.


 At this point, a discussion was held off the record. Thereafter, questioning by the
State and cross-examination by defense counsel continued and was completed without
any further reference to Garcia's criminal history. The jury was excused. Defense counsel
then asked Officer Cavazos about his earlier testimony regarding Garcia's criminal history. 

[Defense counsel]: What did you mean to imply by that?


[Officer Cavazos]: I didn't mean to imply anything other than we had a
better understanding of his character.


 . . . .


[Defense counsel]: So, you meant to imply to the ladies and gentlemen of
the jury that you had a better understanding of his
character because of his criminal history?


[Officer Cavazos]: Yes.


[Defense counsel]: And what was his character that you were trying to
imply?


[Officer Cavazos]: That he had been the suspect of a violent crime.


 Officer Cavazos was excused and defense counsel moved for mistrial. Defense
counsel acknowledged that Officer Cavazos's original answer was non-responsive and was
not intentionally elicited by the State. Nonetheless, he noted that Garcia's criminal history
and the suggestion of a violent nature was made known to the jury. Defense counsel then
stated:

I'm somewhat in a precarious position because I didn't object formally for the
record. Although, I approached the Court--and I don't know if our bench
conference was taken or not. In that bench conference, I complained; and
from a safeguarding standpoint, I didn't object because sometimes it brings
more light to the issue that [sic] if you don't object and just approach. But
nonetheless, we think there's information out there that the ladies and
gentlemen of the jury now have that this defendant somehow has a criminal
history, and that is the reason they proceeded to arrest him at the Wal-Mart
in the manner that they did.


 The trial court denied the motion for mistrial. On appeal, counsel for Garcia argues
that Officer Cavazos violated an agreed order in limine which requested to exclude all
evidence of extraneous crimes or misconduct. Garcia also argues that Officer Cavazos's
testimony amounted to inadmissible character evidence. See Tex. R. Evid. 404.

 During the hearing on the motion for mistrial, Officer Cavazos acknowledged that
prosecutors told him not to talk about Garcia's violent history in front of the jury. Officer
Cavazos explained his earlier testimony as follows:

[Prosecutor]: Okay. We did talk that you can't tell the jury he has a
violent history; is that right?


[Officer Cavazos]: Right.


[Prosecutor]: But the reason you all acted the way that you did was
based on the information that you had before you went
over there; is that correct?


[Officer Cavazos]: That's correct, sir.


[Prosecutor]: And so, when you say you were trying to imply to the
jury what you knew about him, are you saying that you
knew things other--you knew things about him other
than his photograph that caused you all to take the
actions that you did?


[Officer Cavazos]: That's correct, sir.


[Prosecutor]: But you didn't--you knew there were limits on what you
could say in front of the jury; is that right?


[Officer Cavazos]: Yes, sir.


[Prosecutor]: And were you trying to tell--I mean, were you trying to
put in front of the jury that this man had been arrested
before?


[Officer Cavazos]: No. Really, I wasn't. It was for our own safety, you
know, for us to be better aware of what we were dealing
with.


[Prosecutor]: Okay. That was--you all gather that information to
protect yourself and to protect the public and everything
like that--


[Officer Cavazos]: Exactly.


[Prosecutor]: --in making the arrest?


[Officer Cavazos]: Yes, sir.


 Garcia acknowledges that his trial counsel did not object at the time the testimony
was offered. See Tex. R. App. P. 33.1(a). Nevertheless, he argues that an opposing party
has a duty to comply with the order in limine and to instruct the witnesses to do the same. 
Heidelberg v. State, 36 S.W.3d 668, 673 (Tex. App.-Houston [14th Dist.] 2001, no pet.).
Citing Harnett v. State, 38 S.W.3d 650, 655 (Tex. App.-Austin 2000, pet ref'd.), Garcia
notes that non-compliance with an order in limine may lead to contempt or other sanctions
the trial court deems appropriate. While this proposition is accurate, we note that, even
if there has been a violation of the order in limine, it is still incumbent upon a party to object
to the admission or exclusion of evidence in order to preserve error for appeal. Id. 
Because Garcia did not timely object to Officer Cavazos's testimony regarding his prior
conviction, he has not preserved the issue for our review. See Tex. R. App. P. 33.1

 Garcia also complains that the trial court should have instructed the jury to disregard
the statement--otherwise, according to Garcia, the jury may have considered Garcia's
criminal history as evidence against him. Once again, however, Garcia has not preserved
his complaint for appeal. In order to preserve error, a defendant must make a timely
objection, and, if the objection is sustained by the court, the defendant must request a
curative jury instruction and must seek a mistrial if the curative instruction is given. Id.; see
Nethery v. State, 692 S.W.2d 686, 701 (Tex. Crim. App. 1985); Duran v. State, 505
S.W.2d 863, 866 (Tex. Crim. App. 1974); see also Heidelberg, 36 S.W.3d at 672-73 ("If
the objection is sustained, the defendant must move to strike the evidence, that is, to have
it removed from the body of the evidence the jury is allowed to consider."). Here, Garcia
did not object to the testimony or ask for a curative jury instruction to disregard the
allegedly improper testimony. Accordingly, Garcia failed to preserve this complaint for
review. We overrule Garcia's second issue.

C. Admissibility of Crime Scene Videotape and Photographs

 During the guilt/innocence phase of trial, the State offered into evidence a video
recording depicting the crime scene as well as numerous photographs of the victim. Due
to the gruesome nature of the evidence, Garcia objected to the admissibility of the
videotape and certain photographs, claiming that the probative value of the evidence was
substantially outweighed by its prejudicial effect. See Tex. R. Evid. 403. The trial court
overruled the objections. Garcia challenges this ruling by his third issue on appeal.

 When determining whether the trial court erred in admitting relevant photographs
into evidence, our review is limited to determining whether the probative value of the
photos is substantially outweighed by the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by considerations of undue delay or needless
presentation of cumulative evidence. See id.; Young v. State, 283 S.W.3d 854, 874 (Tex.
Crim. App. 2009); Long v. State, 823 S.W.2d 259, 271 (Tex. Crim. App. 1991);
Montgomery v. State, 810 S.W.2d 372, 389 (Tex. Crim. App. 1991) (op. on reh'g). The
probative value of a color photograph or a video recording depicting the recovery of a
murder victim's body may outweigh its prejudicial effect even when the depiction includes
close-ups and lingering camera angles, so long as the images simply reflect the
gruesomeness of the offense. Ripkowski v. State, 61 S.W.3d 378, 392 (Tex. Crim. App.
2001). The trial court's decision is reviewed under an abuse of discretion standard and
may be disturbed on appeal only when falling outside the zone of reasonable
disagreement. Montgomery, 810 S.W.2d at 391.

 A court may consider many factors in determining whether the probative value of
photographs is substantially outweighed by the danger of unfair prejudice. These factors
include: the number of exhibits offered, their gruesomeness, their detail, their size,
whether they are in color or black and white, whether they are close-up, and whether the
body depicted is clothed or naked. Young, 283 S.W.3d at 874. A court, however, should
not be limited by this list; the availability of other means of proof and the circumstances
unique to each individual case should also be considered. Id.

 The video recording at issue here shows De Leon's body as it is being removed
from the apartment. According to Garcia, the video shows an "unclothed cadaver showing
its breasts and genitalia." Garcia argues there was no probative value in showing the body
"in a very gruesome state, burnt and with images of the breasts and genitalia." He further
claims there was no need to introduce the video because "all of this imagery could have
been and was testified to by the officers who were present at the crime scene."

 The photographs depict similar images as shown on the video recording. According
to Garcia, showing a "badly charred body with exposed genitals," "close up views of the
burnt body," "the burnt body with the breasts exposed and the victim's face staring at the
camera," "a close up view of the body showing the exposed breasts and the face," "an
extreme close up of the burnt face of the victim," and "the unclothed victim from her waist
down, showing her exposed genitals" was more prejudicial than probative. See Tex. R.
Evid. 403. He argues, once again, that "the testimony of numerous officers regarding the
location and condition of the body was sufficient." (5)

 We discern no abuse of discretion in the admission of the video recording and
photographs in question. They were all probative of the manner of De Leon's death, and
the manner in which Garcia attempted to destroy evidence of his fingerprints on her body. 
See Ladd v. State, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999). The videotape and
photographs are relevant because they accurately reflect the location and state of the body
when it was discovered and the injuries inflicted on it. See Ripkowski, 61 S.W.3d at 392;
see also McGhee v. State, No. 01-09-00147-CR, 2010 Tex. App. LEXIS 5561, at *16 (Tex.
App.-Houston [1st Dist.] July 15, 2010, no pet. h.) (mem. op., not designated for
publication). They support the testimony that De Leon was strangled with a cable cord and
burned. See Ripkowski, 61 S.W.3d at 392.

 While the images portrayed may be gruesome, they depict nothing more than the
reality of the brutal crime committed and its aftermath. See Paredes v. State, 129 S.W.3d
530 (Tex. Crim. App. 2004). Photographs are not rendered inadmissible merely because
they are gruesome or might tend to arouse the passions of the jury, unless they are offered
solely for the purpose of inflaming the minds of the jury. Potter v. State, 74 S.W.3d 105,
112 (Tex. App.-Waco 2002, no pet.); Ward v. State, 787 S.W.2d 116, 120 (Tex.
App.-Corpus Christi 1990, pet. ref'd). While the crime scene video recording and
photographs do make an indelible impression, they do not depict more than the nature of
the crime. See Ripkowski, 61 S.W.3d at 392. Further, although the videotape and
photographs may have been partially cumulative of other evidence, the trial court could
have reasonably concluded that the probative value of the evidence was not substantially
outweighed by its tendency to prolong the trial. See Ladd, 3 S.W.3d at 568. We conclude
that the trial court did not abuse its discretion in admitting the photographs and video
recording into evidence. Garcia's third issue is overruled.

D. Denial of Motion to Remove Juror

 By his fourth issue, Garcia asserts that the trial court erred in denying his request
to remove a juror. During trial, defense counsel informed the trial court that juror number
five had engaged in a conversation with a witness, Detective Hernandez. Outside the
presence of the jury, defense counsel asked Hernandez whether he had any contact with
the jurors. Detective Hernandez responded as follows:

A. [Detective Hernandez] Any contact with the jurors? I said hi to a relative
of mine.


Q. [Defense counsel] Did you just waive [sic] hi, or did you have a
verbal discussion with her?


A. She came up and said hi to me.


Q. What was discussed or what was said? Tell us
what was actually said.


A. She asked how my baby was, and I said, "She is
fine. How is yours?" And that was the extent of
it.


Q. You didn't mention to her, "I'll talk to you later on
or after this case," or "I'll talk to you in a bit"? 
You didn't mention anything like that?


A. I told her that we would talk after this trial was
done.


Q. Anything else that was said other than that?


A. That was it.


 At the close of its case-in-chief, defense counsel objected to juror number five and
asked that the court "exercise its discretion" to determine whether the conversation that
took place rose to the level of juror misconduct resulting in prejudice to Garcia. (6)
 The trial
court found that the conversation did not "rise to the level of prejudice" and ruled that the
juror remain.

 When a juror converses with an unauthorized person, injury is presumed. Green
v. State, 840 S.W.2d 394, 406 (Tex. Crim. App. 1992). However, the presumption is
rebuttable; if it is shown that the case was not discussed or that nothing prejudicial to the
accused was said, then appellant has not been injured and the verdict will be upheld. Id. 
We defer to the trial court's resolution of historical facts and its determinations concerning
credibility and demeanor, and we view the evidence in the light most favorable to the trial
court's ruling. Quinn v. State, 958 S.W.2d 395, 401-02 (Tex. Crim. App. 1997).

 Here, the uncontroverted evidence established that Detective Hernandez did not
discuss the case with juror number five, nor did he say anything prejudicial to Garcia during
his conversation with the juror. Any presumption of injury was rebutted by this evidence. (7) 
See Green, 840 S.W.2d at 406. Viewing the evidence in the light most favorable to the
ruling, see Quinn, 958 S.W.2d at 401-02, we conclude that the trial court did not abuse its
discretion by denying Garcia's request to remove juror number five. Accordingly, Garcia's
fourth issue is overruled.

E. Ineffective Assistance of Counsel

 By his fifth issue, Garcia claims that he received ineffective assistance of counsel
at trial. To establish a claim for ineffective assistance, Garcia must show (1) his attorney's
representation fell below an objective standard of reasonableness, and (2) there is a
reasonable probability that, but for his attorney's errors, the result of the proceeding would
have been different. Strickland v. Washington, 466 U.S. 664, 668 (1984); Hernandez v.
State, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986); Jaynes v. State, 216 S.W.3d 839, 851
(Tex. App.-Corpus Christi 2006, no pet.). Whether this test has been met is to be judged
on appeal by the totality of the representation, not by any isolated acts or omissions. 
Jaynes, 216 S.W.3d at 851. The burden is on the appellant to prove ineffective assistance
of counsel by a preponderance of the evidence. Id. Our review of counsel's
representation is highly deferential, and we will find ineffective assistance only if the
appellant overcomes the strong presumption that her counsel's conduct fell within the wide
range of reasonable professional assistance. See Strickland, 466 U.S. at 689; Jaynes, 216
S.W.3d at 851. Further, the acts or omissions that form the basis of appellant's claim of
ineffective assistance must be evidenced by the record. See Thompson v. State, 9 S.W.3d
808, 814 (Tex. Crim. App. 1999); Jaynes, 216 S.W.3d at 851. In most cases, a silent
record which provides no explanation for counsel's actions will not overcome the strong
presumption of reasonable assistance. Mallett v. State, 65 S.W.3d 59, 63 (Tex. Crim. App.
2001); Thompson, 9 S.W.3d at 813-14. 

 Garcia complains of several different actions and inactions by his trial counsel. 
Specifically, Garcia argues that his trial counsel was ineffective because: (1) he "fail[ed]
to adequately prepare for trial and present a plausible defense"; (2) he "fail[ed] to object
to [i]nadmissible evidence"; (3) he objected to the consolidation of the case with another
case against Garcia alleging arson and tampering with physical evidence, see Tex. Penal
Code Ann. §§ 28.02, 37.09 (Vernon Supp. 2009); (4) he "failed to strike" a potential juror;
and (5) he made three separate errors during the punishment phase of trial. We will
address each allegation in turn.

 1. Failure to Prepare for Trial and Present a Plausible Defense

 First, Garcia contends that his trial counsel "fail[ed] to adequately prepare for trial"
and "did not offer to the jury any plausible defense." He argues that his counsel waited
until one week before trial to request a witness list from the State, even though it had been
fifteen months since Garcia was arraigned. However, as the State notes, the record
reflects that defense counsel was engaged in discovery long before obtaining the witness
list from the State. In any event, Garcia does not point to any evidence in the record, other
than his own self-serving statements made in an affidavit attached to his motion for new
trial, establishing that his counsel did not investigate the law and facts of the case. See
Thompson, 9 S.W.3d at 814 (noting that claims of ineffective assistance of counsel must
be evidenced by the record); see also McFarland v. State, 928 S.W.2d 482, 501 (Tex.
Crim. App. 1996) (noting that "counsel is charged with making an independent investigation
of the facts of the case").

 Garcia also complains that his counsel never requested that the DNA samples
obtained from Gonzalez be submitted for laboratory analysis. However, Detective
Hernandez testified that Gonzalez, a "person of interest" with respect to De Leon's murder,
came to the police station voluntarily to be interviewed, that Gonzalez was cooperative, and
that police did not find any scratches on Gonzalez. Therefore, Garcia has not shown that,
if his counsel had in fact requested that Gonzalez's DNA samples be submitted for
analysis, the result of the proceeding would have been any different. See Strickland, 466
U.S. at 668; Hernandez, 726 S.W.2d at 57; Jaynes, 216 S.W.3d at 851. We note further
that counsel's decision not to request analysis of Gonzalez's DNA samples may have been
the product of a valid trial strategy, because negative results from such testing would have
been severely detrimental to Garcia's defensive theory. See Skinner v. State, 293 S.W.3d
196, 203 (Tex. Crim. App. 2009) (finding no showing of ineffective assistance where record 
supported conclusion that counsel's failure to seek DNA testing was "a matter of sound trial
strategy").

 2. Failure to Object to Inadmissible Evidence

 Garcia next complains that his trial counsel failed to (1) move for suppression of
evidence seized "while [Garcia] was being detained," and (2) object to testimony
establishing that Garcia refused to voluntarily provide his clothes to police officers.

 To establish an ineffective assistance claim based on counsel's failure to move for
suppression of evidence, an appellant must show that the motion would have been
granted. Jackson v. State, 973 S.W.2d 954, 957 (Tex. Crim. App. 1998). Citing Terry v.
Ohio, 392 U.S. 1, 30 (1968), Garcia argues that the search which produced this evidence
was not incident to a lawful arrest and therefore only a pat-down or frisk was authorized. 
However, the record does not support this interpretation of events. Under the Texas Code
of Criminal Procedure, a warrantless arrest may be made "[w]here it is shown by
satisfactory proof to a peace officer, upon the representation of a credible person, that a
felony has been committed, and that the offender is about to escape, so that there is no
time to procure a warrant . . . ." Tex. Code Crim. Proc. Ann. art. 14.04 (Vernon 2005). 
Here, Detective Cavazos testified that he was assigned to locate Garcia after De Leon's
vehicle was found abandoned. Police knew at the time that De Leon had been murdered,
that her body had been set on fire, and that Garcia was one of the last people to see De
Leon alive. Detective Cavazos located Garcia based on information obtained from Janell,
and he "immediately" smelled smoke on Garcia's person, saw smoke residue around
Garcia's ears and neck, and saw scratches on Garcia's face and neck. Based on this
information, Detective Cavazos was authorized to arrest Garcia without a warrant. See id. 
Accordingly, Garcia has not shown that a motion to suppress evidence obtained incident
to his lawful arrest would have been granted. See Jackson, 973 S.W.2d at 957; Strong v.
State, 138 S.W.3d 546, 555 (Tex. App.-Corpus Christi 2004, no pet.) ("[T]he rule is
well-established that failure to obtain a search warrant is excusable under both the United
States and Texas Constitutions where the search is incident to a lawful arrest."); State v.
West, 20 S.W.3d 867, 871 (Tex. App.-Dallas 2000, pet. ref'd) ("A search incident to a
lawful arrest requires no additional justification.").

 3. Objection to Consolidation of Murder and Arson Cases

 Garcia next argues that his trial counsel was ineffective because he objected to the
State's request to consolidate the underlying case with a separate case in which Garcia
was accused of arson and tampering with physical evidence in connection with the same
criminal episode. Garcia argues that "the primary evidence against [him] was concerning
the arson," and contends that his trial counsel "should have allowed the consolidation so
that the jury had the option to convict [him] of arson and find him not guilty as to murder."
However, as the State correctly notes, "murder and arson are distinct offenses[,] each
containing elements not found in the other, meaning that there was no legal impediment
or jeopardy issue which would prevent [Garcia] from being convicted and sentenced for
both offenses" even if the arson and murder cases were consolidated. See Tex. Penal
Code Ann. §§ 19.02, 28.02. Garcia has therefore not shown that, but for his counsel's
objection to consolidation, the result of the murder trial would have been different. See
Strickland, 466 U.S. at 668; Hernandez, 726 S.W.2d at 57; Jaynes, 216 S.W.3d at 851.

 4. Failure to "Strike" Prospective Juror

 Garcia further contends that his trial counsel erred by failing to exercise a
peremptory challenge against a prospective juror, because that juror was related to one
of the witnesses. (8) Garcia argues that "[t]here would not be any plausible jury strategy to
allow this to happen." However, Garcia does not allege on appeal that, had his trial
counsel used a peremptory challenge on this prospective juror, there is a reasonable
probability that the result of the proceeding would have been different. See Strickland, 466
U.S. at 668; Hernandez, 726 S.W.2d at 57; Jaynes, 216 S.W.3d at 851.

 5. Punishment Phase Errors

 Garcia next alleges that his trial counsel made three errors during the punishment
phase of trial. He first asserts generally that his counsel "was wholly ineffective in the
punishment phase," primarily because he called only one witness, Janell, to testify on his
behalf. Garcia claims that "[t]he complete lack of mitigating or punishment evidence
presented on [his] behalf is clearly ineffective considering the gravity of the charges and
the length of the trial." Garcia does not, however, point to any specific "mitigating or
punishment evidence" that his counsel could have presented, but chose not to. He has not
met his burden to establish ineffective assistance of counsel on these grounds.

 Second, Garcia contends that his trial counsel erred when, during closing argument
at the punishment phase, counsel stated as follows:

I'm asking you to think of what lies ahead for Gabriela's family, what lies
ahead for the family of Mr. Garcia. Is he a person who is worthy of receiving
a 10-year sentence, a 20-year sentence, a 30-year sentence, where it tells
you that he'll serve one-half the time? One-half the time before he's eligible
for parole. At the age of 31, if you're given a 30-year sentence and you
serve half the time, it's about 45. And it doesn't mean that you're going to
get out. It just means you're eligible for parole. Your conduct drives whether
you get out or not. If he has disagreements in 30 years, he's going to be 30
years inside. He'll be 60. At 30 years, if he does everything he's supposed
to, he'll be out at 45. At 30 years, if he doesn't do what he's supposed to,
he'll be out at 60. At 60.


Garcia argues that his "counsel's assertions to the jury regarding the actual amount of time
to be served are completely misleading and detrimental to [Garcia]." However, the remarks
were consistent with the charge of the court as to sentencing, which informed the jury that
it "may consider the existence of the parole law and good conduct time" in arriving at its
decision. It is true that counsel was not entirely accurate in setting forth the law as to
parole--the jury charge stated that, if a term of imprisonment is imposed, Garcia will not
become eligible for parole "until the actual time served equals one-half of the sentence
imposed or 30 years, whichever is less . . ." (emphasis added). Nevertheless, we cannot
say that counsel's performance in making these remarks fell outside the "wide range of
reasonable professional assistance." See Strickland, 466 U.S. at 689; Jaynes, 216 S.W.3d
at 851.

 Finally, Garcia contends that his counsel erred by failing to object to the prosecutor's
statement in closing argument that De Leon's "blood was all over [Garcia's] clothes," noting
that the evidence merely established that De Leon's DNA was all over Garcia's clothes. 
We cannot say that, had defense counsel objected to this language, there is a reasonable
probability that the result of the proceeding would have been different. See Strickland, 466
U.S. at 668; Hernandez, 726 S.W.2d at 57; Jaynes, 216 S.W.3d at 851.

 We overrule Garcia's fifth issue.

F. Notice of Evidence of Prior Conviction

 By his sixth issue, Garcia contends that the trial court erred during the punishment
phase by admitting, over objection, evidence of Garcia's prior conviction for aggravated
assault. Garcia specifically argues that the evidence should have been excluded because
the State did not provide "reasonable notice" of its intent to offer such evidence. See Tex.
Code Crim. Proc. Ann. art. 37.07, § 3(g).

 Here, Garcia filed a request for notice under article 37.07 on September 13, 2006. 
The State did not file its initial response to that request until April 5, 2007, eleven days
before trial was set. When the State offered its extraneous offense evidence at trial,
defense counsel objected, arguing that the State's prior notice misstated the cause number
and date of the extraneous offense and did not state the name of a victim. (9) The trial court
overruled the objection and admitted the evidence.

 We review the admission of extraneous offense or bad act evidence for an abuse
of discretion. Mitchell v. State, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996). The purpose
of article 37.07, section 3(g) is to avoid unfair surprise and to enable a defendant to
prepare to answer the extraneous offense evidence. Luna v. State, 301 S.W.3d 322, 326
(Tex. App.-Waco 2009, no pet.) (citing Apolinar v. State, 106 S.W.3d 407, 414-15 (Tex.
App.-Houston [1st Dist.] 2003), aff'd on other grounds, 155 S.W.3d 184 (Tex. Crim. App.
2005); Roethel v. State, 80 S.W.3d 276, 282 (Tex. App.-Austin 2002, no pet.); Nance v.
State, 946 S.W.2d 490, 493 (Tex. App.-Fort Worth 1997, pet. ref'd)). This analysis
requires examining the record to determine whether the deficient notice resulted from
prosecutorial bad faith or prevented the defendant from preparing for trial. Id. (citing
Roethel, 80 S.W.3d at 282). In determining the latter, we look at whether the defendant
was surprised by the substance of the testimony and whether that affected his ability to
prepare cross-examination or mitigating evidence. Id.

 Assuming, but not deciding, that the State's notice was in fact deficient, we
nevertheless note that Garcia has not established that he was surprised by the substance
of the extraneous offense evidence, nor has he shown that his ability to prepare his case
was detrimentally affected by the admission of that evidence. (10) See id. Moreover, Garcia
has not directed us to anything in the record indicating that the State's tardiness in
providing notice pursuant to his request, or the errors in the notice itself, were the result of
prosecutorial bad faith. See id. Accordingly, we conclude that the trial court did not abuse
its discretion by overruling Garcia's objection to the State's extraneous offense evidence. 
His sixth issue is overruled.

IV. Conclusion

 Having overruled all of Garcia's issues on appeal, we affirm the judgment of the trial
court.


 ________________________

 DORI CONTRERAS GARZA

 Justice


Do not publish.

Tex. R. App. P. 47.2(b)

Delivered and filed the

31st day of August, 2010. 
1. Gilberto Chavero, an arson investigator, testified as an expert witness in arson investigation. He
opined that the fire in the closet was started by a match or a lighter.
2. Mario Arratia, a crime scene assistant for the McAllen Police Department, also assisted in the
removal of Garcia's clothes. Arratia testified that Garcia was very combative and refused to voluntarily remove
his clothes.
3. Adelita Briales testified that she received two calls on her cell phone at approximately 3:00 a.m. on
October 12, 2005. The caller sounded like a young man with a "thick, like a rough kind of voice." Briales told
the caller both times that he had the wrong number. She could not recall the name of the person that the
caller was asking for. Tiburcio Islas Jr. testified that he received a "private" call on his cell phone at
approximately 3:00 a.m. on October 12, 2005, but that he did not answer the call.
4. In his brief on appeal, Garcia states as part of his first issue that "there was insufficient evidence to
submit paragraph two, strangling the victim with his hand, as a potential manner and means of causing the
death of the victim." However, Garcia provides no argument or citation to authority or to the record in support
of this bare statement. Accordingly, to the extent that Garcia intended to raise this as an issue on appeal, it
is waived. See Tex. R. App. P. 38.1(i).
5. At trial, the specific objections lodged were "that the substance of these exhibits, their probative
value is outweighed by the prejudicial effect, they're cumulative, repetitive, duplicitous, and are intended to
inflame and create sympathy with the jury."
6. On appeal, Garcia argues that he was "denied a fair and impartial trial and due process of law when
the court failed to remove Juror no. 5" and cites the standard of review applicable to a motion for mistrial. 
However, Garcia did not move for a mistrial at trial, nor did he object that his constitutional rights were being
denied. He has therefore not preserved these issues for appeal. See Tex. R. App. P. 33.1.

7. Garcia argues that, had his counsel not become aware of the conversation, it would have remained
"secretive." According to Garcia, "[t]hat makes this conversation and behavior by the juror suspect and puts
the juror's and the officer's credibility at issue." Garcia cites no authority for these arguments, and we are not
persuaded by them. See Tex. R. App. P. 38.1(i).
8. The juror referenced by Garcia in this sub-issue is the same juror that had a brief discussion with
a witness, Detective Hernandez. See infra section III.D. The juror stated in voir dire that she is Detective
Hernandez's cousin.
9. We note that the statute requires the State's notice to contain "the date on which and the county in
which the alleged crime or bad act occurred and the name of the alleged victim of the crime or bad act" only
where the State "intends to introduce an extraneous crime or bad act that has not resulted in a final conviction
in a court of record or a probated or suspended sentence." Tex. Code Crim. Proc. Ann. art. 37.07, § 3(g)
(Vernon Supp. 2009) (emphasis added). Here, the extraneous offense evidence offered by the State was a
final conviction for aggravated assault.
10. It is noteworthy that, according to the extraneous offense judgment admitted into evidence, one of
Garcia's attorneys in the instant case also represented him in the prior aggravated assault case.