

## NUMBERS
## 13-09-00088-CR
## 13-09-00089-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**ANTHONY INSCORE,**                                                     **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                                  **Appellee.**

### On appeal from the 130th District Court
### of Matagorda County, Texas.

# MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Yañez and Garza
Memorandum Opinion by Justice Yañez**

In appellate cause number 13-09-088-CR, a jury convicted appellant, Anthony

Inscore, of aggravated sexual assault, a first-degree felony, and assessed punishment at

life imprisonment and a $10,000 fine.[1] In appellate cause number 13-09-089-CR, appellant pleaded guilty to four counts of solicitation of capital murder, each a first-degree felony.[2] The jury assessed punishment at life imprisonment and a $10,000 fine on each count, with all sentences to run concurrently. In each cause, appellant: (1) challenges the legal and factual sufficiency of the evidence to support his convictions; and (2) contends that the trial court erred in admitting certain punishment-phase evidence because he did not receive the required notice. We affirm the trial court's judgment in each cause.

## I. Background

C.A., appellant's step-daughter, was ten years old at the time of the alleged sexual assault.[3] C.A. testified that appellant had her kneel down and put his penis in her mouth. C.A. reported to Sarah Herring, her youth caseworker, that appellant had been touching her genital area. Herring reported the allegations to law enforcement. Charlotte Brown, an investigator with the Matagorda County Sheriff's Department, interviewed C.A. and took her statement. Appellant was arrested for aggravated sexual assault.

While in the Matagorda County Jail awaiting release on bond, appellant met Derek Hiers, another inmate. Hiers testified that after both men were released, appellant contacted him and said that he wanted to hire a hit man to kill his wife and her three children, including C.A. According to Hiers, appellant was afraid that C.A. would be able to identify his penis.[4] Hiers contacted the police. Through several conversations which

---

[1] See TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(ii), (a)(2)(B), (e) (Vernon Supp. 2009).

[2] See id. § 15.03(a), (d)(1) (Vernon 2003).

[3] Pursuant to article 57.02(h) of the code of criminal procedure, we will refer to the child victim by her initials. See TEX. CODE CRIM. PROC. ANN. art. 57.02(h) (Vernon Supp. 2009).

[4] Appellant's wife testified that he is uncircumcised.

2

were recorded, Hiers arranged for appellant to meet an undercover officer posing as a "hit man" in a motel room; the law enforcement officers video-recorded this meeting.

Appellant was tried for both offenses in one proceeding. At the beginning of trial, before the jury, appellant pleaded "not guilty" to aggravated sexual assault and "guilty" to four counts of solicitation of capital murder.

## II. The Evidence

### A. Charlotte Brown

Brown testified that in early August, 2007, she initiated an investigation of C.A.'s outcry of sexual abuse. Brown interviewed C.A. and her mother, Melissa Inscore. Brown testified that she learned C.A. had made a prior outcry of sexual abuse against appellant, but that no criminal investigation occurred in connection with C.A.'s prior outcry. Instead, C.A. was referred to Texana Center for youth counseling services. As a result of Brown's investigation, Melissa and her three children moved into the Women's Crisis Center.[5] Brown testified that C.A. told her that the night before her outcry to Herring, appellant had placed her on the floor in a kneeling position and put his penis in her mouth. Based on this information, Brown obtained a warrant for appellant's arrest.

Brown stated that she was contacted in October 2007, with information that appellant had contacted Hiers for help in obtaining a passport and a gun. Brown met with Hiers on several occasions; Hiers agreed to wear "a wire" to record his conversations with appellant. Hiers met with appellant at a Wal-Mart parking lot. Brown and other officers

---

[5] Melissa's children included K.B., an older female, C.A., and R.A., a younger boy. In the record, K.B. is referred to both as "K.B." and "C.B." In the interest of consistency, we refer to her as K.B. Although C.A. and R.A. have the same father, none of the children are appellant's biological children.

3

were able to observe the meeting and to listen to the conversation.[6]   At the recorded meeting, Hiers told appellant he would find him a "hit man" to get rid of his family.  Brown stated that in early November, Hiers reported that appellant  was "backing off" the plan to have the family killed.  Three weeks later, in late November, Hiers contacted Brown again and stated that appellant wanted to proceed with the plan.[7]  Brown met with Hiers and arranged a meeting at an Econo Lodge motel between appellant, Hiers, and Sergeant Tommy Johnson, who posed as a "hit man."  The motel room was equipped with visual and audio equipment.  Brown testified that after appellant agreed to Johnson killing Melissa and the three children in exchange for a car, the officers arrested him for solicitation of capital murder.

On cross-examination, appellant's counsel established that Melissa had told Brown that she did not believe C.A.'s allegations.  Brown also knew that C.A. had been diagnosed with bipolar disorder and was taking lithium for her condition.  Brown also admitted that on the recorded conversations, appellant denied any sexual misconduct with C.A. and told Hiers that C.A. could identify his penis because she had previously walked in on him while he was in the bathroom.

### B.  Derek Hiers

Hiers testified that he met appellant in jail; appellant asked if Hiers could obtain a gun with a silencer and a passport for him to travel to Argentina.  Appellant told Hiers that he was not guilty of the sexual abuse allegations, but that they were going to "stick it to him." Hiers stated that appellant contacted him after they were both released from jail and

---

[6] CD recordings of three phone calls and a DVD and CD recording of the meeting at the motel were admitted into evidence.  Also admitted and included in the record before us are transcripts of the calls and the motel meeting.

[7] In late November, appellant was served with a protective order.  The transcript of the motel meeting reflects that appellant wanted the victims murdered before his impending court appearance.

4

expressed interest in obtaining a passport and an untraceable gun. Hiers said he spoke to a friend about the situation because he was concerned for the safety of the children. Hiers's friend encouraged him to talk to the police, which he did. Hiers was referred to Brown, and agreed to cooperate by recording his conversations with appellant. Hiers's testimony regarding the conversations with appellant and the meeting at the Econo Lodge was consistent with Brown's testimony. Hiers testified that appellant called him in late November and asked him to call the "hit man." Hiers stated that appellant was concerned because "a restraining order or some kind of—some kind of order was being put up and his kids were going to—his stepkids were going to go on trial. I believe that's what he said. And she was going to be able to identify his penis and stuff." Appellant claimed C.A. knew what his penis looked like because she would peek in on him through the bathroom door. Hiers testified that he had a couple of pending charges against him, but that he had not been promised anything with regard to those charges in exchange for his assistance in the investigation of appellant.

On cross-examination, appellant's counsel attempted to impeach Hiers's credibility by asking whether his tattoos reflected membership in a gang. Hiers also admitted that appellant told him that, after appellant was released from jail, he had been assaulted by some men that he believed were hired by the father of Melissa's children.

### C. Sergeant Tommy Johnson

Johnson testified that he is an undercover narcotics officer. In late November 2007, he was asked to work as an undercover officer in a murder-for-hire. During Sergeant Johnson's testimony, the jury was shown the DVD recording of the meeting in the motel. Sergeant Johnson identified the keys to the vehicle that appellant gave him in exchange for the agreed-upon killings. He also identified the photograph appellant gave him of the

5

intended victims, Melissa and the three children.

### D. Erin Tyler

Erin Tyler testified that she is an English teacher in Victoria. She met appellant on-line in late October 2007, and had a relationship with him for about a month. Tyler stated that appellant wanted to spend the weekend with her on the weekend following November 29, 2007. According to Tyler, appellant first brought up spending the weekend with her in Victoria around November 25 or 26, 2007; appellant brought it up several times and was "insistent" about spending the full weekend with her. Tyler stated she was not receptive to the idea because she had to get up early and go to work on Monday. Tyler testified that appellant told her he was legally separated from his wife and trying to get a divorce. Appellant also told her that he planned to visit his brother in South America. Tyler did not know about the sexual assault allegations pending against appellant or the protective order.

### E. Sarah Herring

Herring testified that in 2007, she was a youth counselor. She was C.A.'s caseworker from April 2007 until she left her position in September 2007. Herring stated that even before C.A.'s outcry, she could tell that C.A. "was always secretive about something" and that "there was something underlining [sic] that wasn't right." Herring testified that in August 2007, C.A. came into her office, started crying, and said she needed "to tell somebody" and "let it out." Herring stated that C.A. told her that appellant was touching her genitals and had been doing it for a long time. Herring said that C.A. had previously reported sexual abuse by appellant, but had later recanted the allegations. Herring contacted law enforcement officers and reported C.A.'s allegations. Herring

reported C.A.'s allegations to Melissa that same day, but Melissa did not believe the allegations.

On cross-examination, Herring stated that C.A. specifically stated that appellant touched her "genitals." According to Herring, C.A. had a very extensive vocabulary for her age. C.A. told Herring that appellant touched her inside her clothes in her vaginal area, but she did not mention oral sex.

On re-direct examination, Herring said that C.A. had been diagnosed with mood disorder, but that she had not been diagnosed with mental illness or bipolar disorder. Herring described C.A.'s demeanor as withdrawn, not wanting to talk, and having occasional unexplained bouts of crying.

### F. Melissa Inscore

Melissa testified that when she married appellant in 2002, C.A. was five years old and K.B., her older daughter, was ten years old.[8] In 2006, when C.A. was ten, the family moved to Utah and stayed almost a year; in March 2007, they moved to Blessing, Texas in Matagorda County. Melissa testified about an incident that occurred in the spring of 2007 in Utah, shortly before the family moved back to Texas. The incident occurred during the day; Melissa was in the living room when C.A. came running from her room, screaming, crying, and "shaking." C.A. told Melissa that appellant had tried to put his penis in her mouth. Appellant denied the allegation and said he would never hurt C.A. Melissa did not believe C.A. and told her that she "shouldn't be lying like that." Melissa did not report C.A.'s allegations to the police or to Child Protective Services ("CPS").

A few months after the family moved to Texas, Melissa learned that C.A. had made

---

[8] K.B. has a different biological father than C.A. and R.A.

another outcry of sexual abuse by appellant; CPS became involved in the investigation. Appellant was required to leave the home for a brief time during the investigation, but was later allowed to return. As a result of the investigation, C.A. was required to attend mental health counseling. Melissa stated that when C.A. made the second allegation of sexual abuse, she talked to appellant about it; again, appellant said he would never hurt C.A.

Melissa testified that from April to August 2007, she and appellant and the children lived together in the house. During this time, C.A. was on medication and was required to attend mental health counseling. In August 2007, Melissa learned that C.A. had made a third outcry alleging sexual abuse by appellant. Melissa stated that she "didn't know what to believe anymore." Appellant encouraged Melissa to seek inpatient treatment for C.A. in a mental hospital. Melissa testified that after appellant suggested that she institutionalize C.A., his demeanor toward her changed; he became more "controlling" and "kind of scary." On the day that appellant suggested inpatient treatment for C.A, Melissa was riding with appellant; she felt "stuck in the car" and appellant did not want her to go home. Appellant drove down a boat ramp very close to the water. Melissa has a fear of water, and screamed at appellant to stop. Melissa perceived appellant's behavior as "threatening." Appellant also took her to the gravesite of a recently-deceased friend; Melissa said appellant's behavior "just felt threatening." Because of appellant's behavior, Melissa changed her opinion about whether C.A. was telling the truth. That day, Melissa talked to C.A. about her allegations. During that conversation, C.A. described appellant's penis. Based on C.A.'s description and the events of the day, Melissa decided that C.A. was telling the truth. Melissa called the youth counseling center, the crisis center, and the police. Melissa and her children moved into the crisis center.

On cross-examination, defense counsel asked about C.A.'s allegation that in Utah, appellant tried to put his penis in her mouth. Melissa admitted that her younger son knew nothing about the incident because he had been asleep. Also, defense counsel elicited testimony that C.A. had been diagnosed with "almost" bipolar disorder.

On re-direct examination, Melissa stated that appellant had never mentioned to her that C.A. would "peep on him" while he was in the shower. She also clarified that C.A. was diagnosed with mood disorder, but had not been diagnosed with bipolar disorder.

### G. C.A.

C.A. testified that she talked to Herring about the sexual abuse because she "couldn't handle it anymore" and because her "family was getting hurt by [appellant]." C.A. stated that while the family was in Utah, she had told Melissa that appellant had tried to put his penis in her mouth, but "[n]othing had happened" because her mother did not believe her. C.A. stated that appellant also touched her on her chest and on her "private part." She also testified that appellant told her that if she told anyone, he would "hurt [her] family." C.A. stated that she told Herring that appellant touched her and told Brown that appellant put his penis in her mouth. When asked where the incident in which appellant put his penis in her mouth occurred, C.A. responded as follows:

Q [by Prosecutor]: What did you tell Miss Brown?

A [C.A.]: He did make me put his penis in my mouth.

Q: And where was that, was that in Utah?

A: Yes. Either it was in Utah or, I mean, Blessing.

Q: Okay. And, so, did he do it in Blessing, too?

A: If I—if he did[,] I don't remember, because I've blocked everything away ever since then until today. I just let

9

everything go.

. . . .

Q: Did [appellant] ever have you kneel down on the floor?

A: Yes.

Q: Where was that?

A: Utah and Blessing.

Q: And Blessing?

A: From what I know, yes.

Q: And when he would have you kneel down on the floor, what did he have you do?

A: In Utah, he tried to put his penis in my mouth and I would run. I would scream and he would zip up his pants, walk down the hall to the living room and make sure my mom was still asleep, walk back in there and tell me to come here. I did. He tried to put me in the bathroom in his bedroom and then I run back into the living room and scream—I mean, the kitchen by the table and screamed.

Q: Did he do the same thing to you in Blessing when he would have you kneel down on the floor?

A: Yes.

Q: Put his penis in your mouth?

A: Yes.

On cross-examination, defense counsel asked C.A. if there were times when she went in the bathroom while appellant was showering. C.A. stated that if she did, she did not remember. On re-direct examination, C.A. stated that she had never seen appellant in the shower without his clothes, but that she had seen his penis before "[i]n Utah and Blessing."

10

## III. Standard of Review and Applicable Law

### A. Legal and Factual Sufficiency

In reviewing the legal sufficiency of the evidence, an appellate court must review all the evidence in the light most favorable to the verdict, and ask whether "'*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt—not whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.'"[9]  The trier of fact is the sole judge of the facts, the credibility of the witnesses, and the weight given to testimony.[10]  We do not reevaluate the weight and credibility of the evidence, and we do not substitute our own judgment for that of the trier of fact.[11]  We resolve any inconsistencies in the evidence in favor of the judgment.[12]

In conducting a factual sufficiency review, a court of appeals reviews the evidence in a neutral light to determine whether the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust or is against the great weight and preponderance of the evidence.[13]  Unless the record clearly reveals that a different result is appropriate, we must defer to the fact-finder's determination concerning the weight to be given to contradictory testimony.[14]

---

[9] *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979)).

[10] *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979); *Jackson*, 443 U.S. at 318-19; *Beckham v. State*, 29 S.W.3d 148, 151 (Tex. App.–Houston [14th Dist.] 2000, pet. ref'd).

[11] *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000) (en banc); *Beckham*, 29 S.W.3d at 151.

[12] *Curry v. State*, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

[13] *Neal v. State*, 256 S.W.3d 264, 275 (Tex. Crim. App. 2008); *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006).

[14] *Lancon v. State*, 253 S.W.3d 699, 705 (Tex. Crim. App. 2008).

Both legal and factual sufficiency are measured by the elements of the offense as defined by a hypothetically correct jury charge.[15] "'Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'"[16]

The testimony of a child sexual abuse victim alone is sufficient to support a conviction for aggravated sexual assault.[17] The victim's description of what happened to her need not be precise, and she is not expected to express herself at the same level of sophistication as an adult.[18] A child victim need not testify to penetration, which the State may prove through circumstantial evidence.[19] However, the testimony of a child victim alone is sufficient evidence of penetration to support a conviction.[20] There is no requirement that the victim's testimony be corroborated by medical or physical evidence.[21] Further, outcry testimony alone can be sufficient to sustain a conviction for aggravated sexual assault.[22]

---

[15] *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997).

[16] *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik*, 953 S.W.2d at 240).

[17] *Soto v. State*, 267 S.W.3d 327, 332 (Tex. App.–Corpus Christi 2008, no pet.); *see also Gomez v. State,* No. 13-08-157-CR, 2009 Tex. App. LEXIS 6985, at *14 (Tex. App.–Corpus Christi Aug. 31, 2009, no pet.) (mem. op., not designated for publication).

[18] *Soto*, 267 S.W.3d at 332.

[19] *Villalon v. State,* 791 S.W.2d 130, 133 (Tex. Crim. App. 1990).

[20] *Ozuna v. State,* 199 S.W.3d 601, 606 (Tex. App.–Corpus Christi 2006, no pet.) .

[21] *Soto*, 267 S.W.3d at 332; *Ozuna*, 199 S.W.3d at 606.

[22] *Ozuna*, 199 S.W.3d at 606 (citing *Rodriguez v. State*, 819 S.W.2d 871, 873-74 (Tex. Crim. App. 1991); *Kimberlin v. State*, 877 S.W.2d 828, 831-32 (Tex. App.–Fort Worth 1994, pet. ref'd)).

The State is not required to present direct evidence, such as eyewitness testimony, to establish guilt.[23]  "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt."[24]  The law does not require that each fact "point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction."[25]

As to the aggravated sexual assault offense, the hypothetically correct jury charge against which we measure the legal and factual sufficiency of the evidence would ask if the appellant:  (1) on or about August 9, 2007, in Matagorda County; (2) intentionally or knowingly; (3) caused his sexual organ to contact or penetrate the mouth of C.A.; and (4) C.A. was younger than fourteen years old.

A person commits the offense of solicitation if, "with intent that a capital felony or felony of the first degree be committed, he requests, commands, or attempts to induce another to engage in specific conduct that, under the circumstances surrounding his conduct as the actor believes them to be, would constitute the felony or make the other a party to its commission."[26]  The offense of criminal solicitation is completed when the culpable request or inducement to commit a capital felony or a first-degree felony is unilaterally presented.[27] Proof that the felony is actually committed is not required to

---

[23] *See Guevara v. State*, 152 S.W.3d 45, 49 (Tex. Crim. App. 2004).

[24] *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Guevara*, 152 S.W.3d at 49.

[25] *Hooper*, 214 S.W.3d at 13; *see Guevara*, 152 S.W.3d at 49.

[26] TEX. PENAL CODE ANN. § 15.03(a); *see Simpson v. State*, No. 13-07-489-CR, 2008 Tex. App. LEXIS 6382, at *19 (Tex. App.–Corpus Christi Aug. 21, 2008, no pet.) (mem. op., not designated for publication).

[27] *See* TEX. PENAL CODE ANN. § 15.03(a); *State v. Brinkley*, 764 S.W.2d 913, 915 (Tex. App.–Tyler 1989, no pet.).

establish the offense of solicitation.[28]  Guilt of solicitation may be established solely by proving the communication and the culpable intent.[29]

## B.  Extraneous Offense Evidence

We review a trial court's ruling concerning the admissibility of evidence of other crimes, wrongs, or acts under an abuse-of-discretion standard.[30]  Likewise, the trial court's determination of whether notice of intent to introduce evidence of other crimes, wrongs, or acts is reasonable is reviewed under an abuse-of-discretion standard.[31]  We will not reverse a trial court's decision admitting evidence unless the decision is outside the "zone of reasonable disagreement."[32]

## IV.  Discussion

In his first two issues of each cause, appellant challenges the legal and factual sufficiency of the evidence to support his convictions.  We first address appellant's challenge to the sufficiency of the evidence to support his conviction for aggravated sexual assault.

## A.  Aggravated Sexual Assault

With regard to appellant's challenge to the legal and factual sufficiency of the evidence to support his conviction for aggravated sexual assault, appellant points to C.A.'s "inconsistent statements and testimony."  Specifically, appellant points to C.A.'s testimony

---

[28] *Brinkley*, 764 S.W.2d at 915.

[29] *Id.*

[30] *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991).

[31] *See Hayden v. State*, 66 S.W.3d 269, 271 (Tex. Crim. App. 2001).

[32] *See Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003).

14

that appellant put his penis in her mouth in "either" Blessing or Utah.

C.A. testified that appellant had her kneel on the floor and that he put his penis in her mouth in Blessing. C.A.'s testimony alone is sufficient to support a conviction for aggravated sexual assault.[33] We defer to the jury to resolve conflicts in testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts.[34] Reviewing the evidence in the light most favorable to the verdict, we hold that a reasonable fact-finder could have found that appellant intentionally or knowingly caused his sexual organ to penetrate the mouth of C.A., a child under the age of fourteen, on August 9, 2007, beyond a reasonable doubt.[35] Accordingly, the evidence was legally sufficient to support appellant's conviction for aggravated sexual assault.[36] Reviewing the evidence in a neutral light, we cannot say that the evidence is so weak that the verdict was clearly wrong, manifestly unjust, or against the great weight and preponderance of the evidence.[37] Accordingly, we conclude that the evidence was factually sufficient to support appellant's conviction for aggravated sexual assault.[38]

We overrule appellant's first and second issues in the aggravated sexual assault case.

---

[33] *See Soto*, 267 S.W.3d at 332.

[34] *See Hooper*, 214 S.W.3d at 13 ("The reviewing court must give deference to 'the responsibility of the trier of fact to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'") (quoting *Jackson*, 443 U.S. at 318-19).

[35] *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(ii).

[36] *See Laster*, 275 S.W.3d at 517.

[37] *See Watson*, 204 S.W.3d at 415.

[38] *See id.*

## B. Solicitation of Capital Murder

Appellant contends that the evidence is legally and factually insufficient to support his conviction for solicitation of capital murder because regardless of his guilty plea, "the State did not prove that he engaged in criminal solicitation as defined in the penal code and alleged in the indictment." Appellant argues that "[u]nlike most jurisdictions, Texas has a procedural requirement that the State must offer sufficient proof to support a judgment based on a guilty plea in a felony case tried to the court."[39] Appellant also argues that Johnson's testimony "was not adequately corroborated."[40]

The State responds that where an appellant pleads guilty before a jury to a felony offense, he admits all elements of the offense.[41] We agree. Article 1.15 of the code of criminal procedure, which requires the State to introduce "sufficient evidence" to support the trial court's judgment, applies when a defendant pleads guilty before *the court* in a noncapital felony case.[42] It is not applicable where, as here, a defendant pleads guilty

---

[39] *See* TEX. CODE CRIM. PROC. ANN. art. 1.15 (Vernon 2005) (providing that when a defendant in Texas pleads guilty before the court in a noncapital felony case, the state must introduce "sufficient evidence" to support the trial court's judgment).

[40] *See* TEX. PENAL CODE ANN. § 15.03(b) ("A person may not be convicted under this section on the uncorroborated testimony of the person allegedly solicited and unless the solicitation is made under circumstances strongly corroborative of both the solicitation itself and the actor's intent that the other person act on the solicitation.").

[41] *See Carroll v. State*, 975 S.W.2d 630, 631-32 (Tex. Crim. App. 1998).

[42] *See* TEX. CODE CRIM. PROC. ANN. art. 1.15.

before a jury.[43]   Moreover, appellant's complaint that Johnson's testimony is "uncorroborated" is without merit.  Brown testified that at the meeting at the Econo Lodge, appellant agreed to Johnson killing Melissa and the children in exchange for a car.  The jury also saw the video recording of the meeting in which appellant agreed to the killing.  We overrule appellant's first and second issues challenging the sufficiency of the evidence to support his conviction for solicitation of murder.

## C.  Extraneous Bad Acts

By his third issue in both causes, appellant complains that the trial court erred during the punishment phase of the trial in admitting evidence about certain extraneous bad acts because the State failed to provide proper notice under article 37.07, section 3(g) of the code of criminal procedure.[44]  Specifically, appellant complains that the trial court allowed the testimony of K.B., C.A.'s older sister, and others regarding alleged sexual abuse by appellant.[45]

The State responds that it provided appellant reasonable notice of its intent to use the extraneous bad acts evidence by providing defense counsel with copies of all

---

[43] *See Fuller v. State*, 253 S.W.3d 220, 227 (Tex. Crim. App. 2008) ("[A] plea of guilty made to a jury is the functional equivalent of a jury verdict of guilty.  This is just as true in a capital-murder trial as in a non-capital criminal trial.  When a defendant pleads guilty to a jury, the jury need not return any verdict of guilty. The case simply proceeds with a unitary punishment hearing."); *see also Griffin v. State*, 255 S.W.3d 774, 775 (Tex. App.–Amarillo 2008, no pet.) (noting that where a defendant pleads guilty before a jury, "there remains no issue of guilt to be determined, it is proper for the trial judge in his charge to instruct the jury to return a verdict of guilty" and then charge only on punishment) (quoting *Holland v. State*, 761 S.W.2d 307, 313 (Tex. Crim. App. 1988)); *Menefee v. State*, No. 12-07-001-CR, 2010 Tex. App. LEXIS 6665, at **8-15 (Tex. App.–Tyler Aug. 18, 2010, no pet. h.) (detailing history of article 1.15 of code of criminal procedure) (mem. op., not designated for publication).

[44] *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(g) (Vernon Supp. 2009).

[45] At the punishment phase of trial, the State presented the testimony of Brown, appellant's former wife Beth Richardson, K.B., and A.I., appellant's biological daughter.

information that the State had, including witness statements detailing the alleged abuse.[46] The State argues that appellant: (1) was not unfairly surprised because he had actual notice of the information the State subsequently offered as evidence; and (2) cannot show harm because he was not so surprised that he was unable to defend against the evidence.

We need not decide whether the trial court erred in admitting the extraneous bad acts evidence, however, because even if we assume error, any such error was harmless.

Error in admitting evidence with insufficient notice under article 37.07, section 3(g) is nonconstitutional error.[47] A nonconstitutional harm analysis for statutory violations is performed under Texas Rule of Appellate Procedure 44.2(b).[48] To assess nonconstitutional errors, we examine whether the purpose of the statute or rule violated was thwarted by the error.[49] The purpose of article 37.07, section 3(g) is to avoid unfair surprise and to enable a defendant to prepare to answer the extraneous offense evidence.[50] This analysis requires examining the record to determine whether the deficient notice resulted from prosecutorial bad faith or prevented the defendant from preparing for trial.[51] In determining the latter, appellate courts look at whether the defendant was surprised by the substance of the testimony and whether that affected his ability to prepare

---

[46] We note that the clerk's record contains a "Notice of Intent to Introduce Evidence of Extraneous Offenses, Bad Acts & Character," which details witnesses, identifies dates and counties, and briefly describes the alleged conduct. The clerk's record also contains statements titled "Summary of Outcry" for C.A., K.B., and A.I. These summaries describe the alleged acts of sexual abuse.

[47] *Luna v. State*, 301 S.W.3d 322, 326 (Tex. App.–Waco 2009, no pet.) (citing *Apolinar v. State*, 106 S.W.3d 407, 414 (Tex. App.–Houston [1st Dist.] 2003), *aff'd on other grounds*, 155 S.W.3d 184 (Tex. Crim. App. 2005); *Roethel v. State*, 80 S.W.3d 276, 281 (Tex. App.–Austin 2002, no pet.)).

[48] *See* Tex. R. App. P. 44.2(b); *Gray v. State*, 159 S.W.3d 95, 97-98 (Tex. Crim. App. 2005).

[49] *Luna*, 301 S.W.3d at 326.

[50] *Id.*

[51] *Id.*

cross-examination or mitigating evidence.[52]

Here, appellant does not argue that the allegedly defective notice resulted from prosecutorial bad faith, and the record does not reflect prosecutorial bad faith. As noted, the State provided the defense with witness statements detailing the specific allegations of abuse. Appellant has not established that he was surprised by the substance of the testimony, nor has he shown that his ability to prepare his case was detrimentally affected by the admission of that evidence.[53] The only argument appellant makes regarding harm is that "because he received the maximum punishment for a first[-]degree felony[—]life imprisonment, harm has been shown." He also asserts that "evidence showing a continuing pattern of child abuse on the part of Appellant that stretched over a period of years likely had a substantial and injurious effect on the jury's verdict on the punishment."

We conclude appellant has not shown he was harmed by the trial court's admission of the extraneous bad acts evidence. We overrule appellant's third issue in each cause.

## V. Conclusion

We affirm the trial court's judgments in both causes.

LINDA REYNA YAÑEZ,
JUSTICE

Do not publish.
TEX. R. APP. P. 47.2(b).
Delivered and filed the
31st day of August, 2010.

---

[52] Id.

[53] See id.